[No. 27099. *En Banc.* November 18, 1938.]

JOANNA BERNARD CONANT, *Respondent and Cross-appellant,* v. THE STATE OF WASHINGTON *et al., Appellants.*[1]

[1]Reported in 84 P. (2d) 378.

The *Attorney General* and *Harry L. Parr, Assistant* (*Dorothee Scarbrough Wolfe,* of counsel), for appellants.

*Richard A. Williams* (*Norman A. Ericson,* of counsel), for respondent and cross-appellant.

MILLARD, J.—On August 2, 1937, Joanna Bernard Conant, a widow seventy-eight years of age, who has been a resident of this state continuously from 1887 to date and who has neither income nor property, filed with the state department of social security her application for old-age assistance. This applicant, who admits that she is supplied with the necessities of life (food, lodging and clothing) by her son-in-law and daughter, who are willing and financially able to take care of her, claims old-age assistance as a matter of right under the statute (Laws of 1935, chapter 182, p. 855, as amended by Laws of 1937, chapter 156, p. 548, Rem. Rev. Stat. (Sup.), § 9998-1 [P. C. § 6233-151] *et seq.*), which defines the requirements for eligibility

for the receipt of old-age assistance and provides for the payment of not less than thirty dollars monthly to the applicant who meets the eligibility requirements.

The qualifications for old-age assistance, the amount and nature of old-age assistance which an eligible applicant shall receive, and the provisions respecting the action of the department in granting assistance, are set forth in the statute as follows:

"Subject to the provisions of this act, every person residing in the State of Washington, if in need, shall be entitled to old-age assistance from the state." Laws of 1935, p. 855, § 2, Rem. Rev. Stat. (Sup.), § 9998-2 [P. C. § 6233-152].

"Old-age assistance shall be given under this act to any person who;

"(a) Has attained the age of 65 years: *Provided,* That if the Federal government provides for Federal contribution to state old-age assistance payable to persons of age less than 65 years, then and in that event persons shall be entitled to assistance hereunder at such age as shall be provided in said Federal act;

"(b) Has income which is less than three hundred sixty dollars ($360) per year;

"(c) Has been a resident of the State of Washington for at least five years within the ten years immediately preceding his application for old-age assistance;

"(d) Is not at the time an inmate of a public institution of a custodial, correctional or curative character, except in the case of temporary medical or surgical care in a hospital;

"(e) Has not made a voluntary assignment or transfer of property for the purpose of qualifying for such assistance;

"(f) Is not because of his physical or mental condition in need of continued institutional care." Laws of 1937, p. 548, § 1, Rem. Rev. Stat. (Sup.), § 9998-3 [P. C. § 6233-153].

"It shall be the duty of the department of social security to provide adequately for those eligible for old-age assistance under the provisions of this act. The

amount and nature of old-age assistance which any such person shall receive, and the manner of providing it,. shall be determined by the said department with due regard to the conditions existing in each case; but such assistance together with the applicant's own resources and income shall not be less than the sum of thirty dollars ($30). per month to each recipient: *Provided,* That in the event Federal participation shall be granted in excess of fifteen dollars ($15) a month per recipient, the maximum may be increased to twice the amount that may be recovered for each recipient from Federal sources. The old-age assistance may include, among other things, medical and surgical and hospital care and nursing." Laws of 1937, p. 549, § 2, Rem. Rev. Stat. (Sup.), § 9998-4 [P. C. § 6233-154].

"Upon the completion of its investigation, the department of social security shall decide whether the applicant is eligible for and should receive an old-age assistance grant under this act, the amount of the assistance, the manner of paying or providing it and the date on which the assistance shall begin. The department may make such additional investigation as it may deem necessary, and shall make its decision as to the granting of assistance and the amount and nature of assistance to be granted the applicant as in its opinion is justified and in conformity with the provisions of this act. The department shall notify the applicant of its decision in writing. Such decision shall be subject to a fair hearing, which hearing under the provisions of this section, unless appellant shall otherwise stipulate, shall be held in the county in which the appellant resides and shall be conducted by the director of the department of social security, a duly appointed, qualified and acting supervisor thereof, or by an examiner specially appointed by the director for such purpose. Whenever a hearing is conducted by a supervisor or specially appointed examiner, a transcript of the testimony shall be made and included in the record which shall be submitted to the director for his decision.

"Any appellant, feeling himself aggrieved by the decision of the director in any case, shall have the right of appeal to the superior court of the county of

his legal residence, which appeal shall be taken by notice filed with the clerk of the court and served upon the director within thirty (30) days after the decision of the director." Laws of 1937, p. 550, § 6, Rem. Rev. Stat. (Sup.), § 9998-8 [P. C. § 6233-158].

After hearing thereon, the application was rejected by the director of the department of social security on the ground that, as she was provided by her son-in-law and daughter with all the necessities of life, the applicant was not *in need* and, therefore, is not eligible to receive aid under the provisions of the old-age assistance statute (Rem. Rev. Stat. (Sup.), § 9998-1 *et seq.*).

The appeal of the claimant to the superior court for Spokane county resulted in reversal of the order denying the application for old-age assistance. A judgment was entered requiring the director of the department of social security to grant the application for old-age assistance in a sum of not less than thirty dollars monthly commencing November 7, 1937, the date of the order denying the application,

". . . and the said Director is hereby ordered to so allow said claim and pay the same in regular order as provided by the statute relating to allowed claims."

The department has appealed from that judgment. The applicant cross-appeals from that portion of the judgment which fails to allow her claim from August 2, 1937, the date her application was filed with the department.

Counsel for appellant contend that, as she is provided by her son-in-law with all of the necessities of life, respondent is not "in need," hence is not eligible to receive old-age assistance.

By Laws of 1933, chapter 29, p. 173, the legislature imposed upon the board of county commissioners of each county the duty of providing funds for old-age pensions. That statute was repealed by Laws of

1935, chapter 182, p. 855, in which the legislature declared that the care of aged persons who are in need or whose physical or other condition seems to render permanent their inability to provide properly for themselves, was a matter of state concern and a necessity in promoting and preserving the public health and welfare. To provide such care, a statewide system of old-age assistance was established. Subject to the provisions of that act, every person residing in the state of Washington, if *in need,* became entitled to old-age assistance from the state. The foregoing statute was amended by Laws of 1937, chapter 156.

In 1937, asserting that public policy declares with increasing frequency and firmness that the equalization of opportunity for more abundant living and the necessary care of the handicapped and underprivileged incident thereto, is a public responsibility of such magnitude as to deserve the undivided attention of all branches of the state and Federal governments, the legislature created an administrative state department and divisions thereof to serve as an agency of the state in the administration of all public assistance programs.

Laws of 1937, chapter 111, p. 442, created the department of social security and its several divisions. Laws of 1937, chapter 114, p. 452 (Rem Rev. Stat. (Sup.), § 9992-101 [P. C. § 6233-101]), provides for aid to dependent children. Laws of 1937, chapter 132, p. 489 (Rem. Rev. Stat. (Sup.), § 10007-1 [P. C. § 6233-53] *et seq.*), establishes within the department of social security a division for improving the condition of the blind. Laws of 1937, chapter 156, relates solely to old-age assistance, prescribes the qualifications for eligibility for old-age assistance, and provides for minimum payment to applicants who are eligible under the act for old-age assistance. Laws of 1937, chapter 162, p. 574

(Rem. Rev. Stat. (Sup.), § 9998-101 [P. C. § 6233-301] *et seq.*), provides for relief from involuntary unemployment. Laws of 1937, chapter 180, p. 697 (Rem Rev. Stat. (Sup.), § 10007-101 [P. C. § 6233-201] *et seq.*), is the administrative code of the department of social security. Its provisions govern the procedure necessary to be followed in order to secure public assistance or to prosecute appeals in those cases in which the applicant for assistance is dissatisfied.

Section 22, chapter 180, Laws of 1937, p. 709 (Rem. Rev. Stat. (Sup.), § 10007-122), repealed the statute (Laws of 1854, pp. 395-397, Rem. Rev. Stat., §§ 9981-9984, inclusive, and *id.*, §§ 9987-9991, inclusive) requiring certain relatives (if such relatives are "of sufficient ability") of every poor person who is unable to earn a livelihood because of physical or mental disability to support such poor people.

We held in *Moss v. Moss*, 163 Wash. 444, 1 P. (2d) 916, that the term "poor" person, under the statute requiring one relative to support another relative who is unable to earn a livelihood, means such person who is so completely destitute as to require assistance from the public.

It should be borne in mind that, in so far as the assistance of one's relatives are concerned, at the common law no legal liability rested on one relative to support another, however strong the moral duty may be. The duty of providing such support is purely statutory, and the procedure providing for its enforcement is exclusive. 21 R. C. L. 723; *Moss v. Moss*, 163 Wash. 444, 1 P. (2d) 916; *Occidental Life Ins. Co. v. Powers*, 192 Wash. 475, 47 P. (2d) 27.

The statute imposing the legal liability, which did not exist at the common law, upon certain relatives to support a poor relative who was unable to earn a livelihood because of mental or physical disability, was

repealed by the social security statute (Laws of 1937, chapter 180), which declared that the burden of caring for the handicapped and underprivileged was a public responsibility which the state assumed. Except morally, since the enactment of Laws of 1937, chapter 180, one relative is not liable nor responsible for the care of another relative who may be "poor" or "in need" because of mental, physical, or other handicap.

The social security statutes manifest recognition by the state of its obligation and disclose the purpose of the legislature to redeem a promise made to the people, to relieve charitably disposed relatives, strangers, societies, associations, and other agencies of the burden of providing relief for the crippled, the blind, the needy, as the care of the handicapped and underprivileged is a responsibility of the state.

A person "in need" and eligible to receive old-age assistance, the legislature provided, is one who has attained the age of sixty-five years, has income less than three hundred and sixty dollars per annum, has been a resident of this state at least five years within the ten years immediately preceding the application for old-age assistance, is not an inmate of a public institution of a certain character, has not transferred property for the purpose of qualifying for old-age assistance, and is not in need of continued institutional care because of his physical or mental condition. If the foregoing conditions prerequisite to the granting of old-age assistance obtain, the statute then provides that it is the duty of the department of social security to provide adequately for such eligible applicant. The law is plain that, while the amount and nature of old-age assistance which the applicant shall receive, and the manner of providing it, shall be determined by the department with due regard to the conditions existing in each case, such assistance, together with the appli-

cant's *own* resources and income, shall not be *less* than thirty dollars monthly to each recipient.

The respondent has neither resources nor income and satisfies all of the other conditions of the statute; therefore, she is *in need.* She is so completely destitute as to require assistance, within the meaning of the old-age assistance statute. The fact that some kindly disposed stranger, or that some charitably motivated relative, is willing and financially able to pay for the clothing, lodging, and food of the respondent, in nowise absolves the state of its duty or relieves it of its obligation to grant to her old-age assistance in a sum not less than thirty dollars monthly. If respondent were compelled to beg from door to door, or if she were dependent on some one of the many charitable associations for support, her *need* would be no greater than if compelled, as she now is, to accept the necessary relief of food, lodging, and clothing gratuitously bestowed on her by a son-in-law and daughter (relatives who are not legally liable or responsible for her care).

The legislature imposed a mandatory duty of payment of old-age assistance of not less than thirty dollars monthly to those who satisfy the statutory prerequisites recited above. We must declare the law as it is written. (*State ex rel. Schmidt v. Sullivan,* 190 Wash. 600, 69 P. (2d) 828; *State ex rel. Hart v. Gleason,* 189 Wash. 292, 64 P. (2d) 1023.)

The naive argument that the cost to the state, in view of the fact that, on January 1, 1937, there were approximately 123,000 persons more than sixty-five years old in this state, would have a serious effect on the fiscal problems of the state, should be addressed to the legislature and not to the court.

*Soper v. Wheeler,* 239 Mass. 327, 132 N. E. 46, cited by appellant, is distinguishable from the case at bar.

In that case, it was held that, if a mother with dependent children has relatives and friends who are willing and able to support her and her children in a reasonable degree of comfort, the overseers of the poor cannot be compelled to furnish aid to her at the public expense. The supreme judicial court of Massachusetts held that the furnishing of aid at the public expense under the pertinent statute was not a mandatory duty, in view of the provision of the statute which provides, contrary to the declared policy of this state, that necessary aid for the mother and children which can be secured from relatives, organizations, or individuals, absolves the commonwealth of its duty to provide for the relief of the poor, the aged, etc.

The question suggested by citation of § 8, chapter 180, Laws of 1937, p. 703, Rem. Rev. Stat. (Sup.), § 10007-108, and quotation of the following language of that section, of payment of old-age assistance in excess of the minimum of thirty dollars monthly, is not before us on this appeal:

"The administrator shall grant public assistance only after adequate investigation and certification of need, the amount of assistance to be determined on a budgetary basis and conform with law and shall take into account both the needs and resources of the applicant and his dependents and any or all persons who may be responsible for his care."

Respondent's cross-appeal presents the question whether the trial court should have allowed old-age assistance from the date the claim was filed, August 2, 1937, instead of from November 7, 1937, the date of the entry of the order denying the application.

The statute provides that old-age assistance shall be granted to any person who complies with certain requirements cited above. Respondent filed her application August 2, 1937, establishing her eligibility. Her

right to old-age assistance accrued coincident in time with the filing of that application.

The judgment is affirmed on defendants' appeal and modified on plaintiff's cross-appeal. The superior court is directed to refer the cause to the department of social security with an order requiring it to proceed in harmony with the foregoing opinion.

MAIN, BEALS, BLAKE, GERAGHTY, and HOLCOMB, JJ., concur.

ROBINSON, J. (dissenting)—With all due respect to the majority, I cannot bring myself to concur in the foregoing opinion. The matter involved is of such compelling importance that I feel it my duty to express my dissent at length.

It is said to have been the custom of savage peoples either to kill outright those who became too old or infirm to support themselves, or, what is equivalent, to expel them from the tribe. But with the coming of civilization, the care of the aged and infirm who had no means of support became recognized as a governmental duty. That duty, until recently, was almost universally carried out by the maintenance of almshouses and poorhouses at the public expense.

This system, however, did not recognize that it was the duty of the state to support those whose children or families were able to supply their needs. That duty was imposed upon their children by a moral law of unascertainable antiquity, and is implicit in Jehovah's command to the Hebrew race: "Honor thy father and thy mother that thy days may be long upon the land which the Lord thy God giveth thee." Exodus, Chapter 21. This divine ordinance was accepted by the early Christians as binding upon them also, and for more than twenty centuries has remained an integral part of the moral code of the Christian world. Nor is

this principle of filial duty confined to Jews[a] and Christians, as witness the tender care of their aged by the great peoples of the Orient. It is not too much to say that the duty of the family unit to care for its aged, if able to do so, has, for centuries, been recognized by all peoples having any pretense to civilization.

Everyone is familiar with the fact that, not many years ago, a great American fraternal order began a nation-wide movement to wholly reform the governmental method of caring for the aged and infirm who had no relatives to care for them or any other means of support. It denounced the poorhouse system as cruel, inhuman, and wasteful, and proposed that the states should substitute for it a system of direct, periodic payments. But it did not, as may be seen by examining the specific legislation it sponsored in our own state, aim at extending the governmental liability or responsibility to include persons other than those in *actual* need. It sought only a change of method, a better way than the poorhouse system of discharging the long-recognized governmental liability. Due to a variety of causes, that movement, after a halting beginning, gained public support with astounding rapidity. The poorhouse method of caring for aged persons in actual need was discarded in the state of Washington in 1933, by the close of 1934 it had been discarded in twenty-eight states, and by March of the current year had been succeeded by some other method in every state of the Union.

It is held by the majority that the legislature of 1937 went far beyond a mere reform in the method of discharging the governmental liability, and enormously extended the field of that liability; that, acting in concert with the Federal government, it undertook to insure to every person over sixty-five years of age and having certain residence qualifications, etc., an income

of at least $360 per year; that is, that it deliberately and intentionally lifted from the wealthy and well-to-do the burden of supporting their aged relatives and placed it squarely upon the taxpayers. The application of this holding to the instant case is as follows:

The respondent, as is stated by the majority, admits that she is, and has been, supplied with all the necessaries of life by her daughter and son-in-law, and that they are financially able to, and willing to, continue to furnish her with everything she needs; but, in reliance upon Laws of 1937, chapter 156, she demands, *as a matter of right,* that the taxpayers (state and Federal) pay her thirty dollars per month. The majority not only sustain this claim of right, but hold that it vested in the applicant on the date of her application and conclude the opinion with this direction:

"The superior court is directed to refer the cause to the department of social security with an order requiring it to proceed in harmony with the foregoing opinion."

Since Mrs. Conant's application was made on August 2, 1937, I take it that the superior court is directed to order the department of social security to pay Mrs. Conant at once more than four hundred dollars, and then to continue to pay her thirty dollars per month. Yet, Mrs. Conant has not been in actual need at any time since August 2, 1937; and, if she is paid four hundred and eighty dollars on December 2nd, she will certainly not be in need for some months to come.

It may be noted in passing that the Federal social security board will, of course, not be bound by any such order, and I venture to predict that, if these payments are made, the Federal authorities will neither contribute to the lump sum payment nor to the

monthly payments ordered made thereafter. But of that, later.

The whole question at issue revolves around whether the legislature intended to set up a pension plan wherein an aged person becomes, of right, entitled to certain continuous, periodical payments, upon having established that his or her income is less than a certain sum, or an old-age assistance plan wherein, while certain limits and standards are set up, it is left to the discretion of the department of social security, through its director, to fix the amount of the initial payment in accord with the actual needs of the applicant, with the further duty and power to increase or decrease it from month to month as those needs fluctuate, or abandon payment altogether in case the need terminates and to restore it again in case it revives.

At the threshold of the inquiry suggested by the preceding paragraph, I wish to make it undisputably plain that the legislature of 1937, in setting up our state social security system by the passage of the series of acts listed in the majority opinion, intended to set up a system which would dovetail with, harmonize with, and supplement, the Federal social security act of August, 1935. I quote from chapter 111, p. 445, § 12, of this series of statutes:

"*The director of social security shall be the responsible state officer for the administration of,* and the disbursement of all funds which may be received by the state in connection with, *old-age assistance,* unemployment compensation, the Washington state employment service, aid to dependent children, aid to the blind, services for crippled children, child-welfare services, vocational rehabilitation, *and all other matters included in the Federal social security act approved August 14, 1935, or as the same may be amended,* . . ." (Italics in the foregoing quotation and throughout this opinion are supplied.) Rem. Rev. Stat. (Sup.), § 10785-11 [P. C. § 6233-32].

It also sought to take advantage of the Federal legislation on the subject and to pass such an act or acts as should entitle this state to Federal grants. I quote § 12 of chapter 156, p. 553:

*"The state hereby accepts the provisions of that certain act of the Congress of the United States entitled, An Act to provide for the general welfare by establishing a system of Federal old-age benefits, and by enabling the several states to make more adequate provisions for aged persons,* blind persons, dependent and crippled children, maternal and child welfare, public health, and the administration of their unemployment compensation laws; to establish a Social Security Board; to raise revenue; and for other purposes, and such other act with like or similar objects as may be enacted." Rem. Rev. Stat. (Sup.), § 9998-26 [P. C. § 6233-176].

In fact, in the preamble to the last of that series of acts, chapter 180, which, we have hitherto held in *State ex rel. Shomaker v. Superior Court,* 193 Wash. 465, 76 P. (2d) 306, must control chapter 156, in so far as chapter 156 is inconsistent therewith, the legislature evinced the unmistakable intention of entering into a partnership with the other states of the Union, under the supervision of the Federal government, to promote the aims and objects of the national social security act and to integrate the state system into "a uniform nation-wide administration," and that this object might be fully accomplished, it directed our state department of social security to adhere to "rules and regulations of the Federal government." This preamble reads as follows:

*"Preamble.* Public policy declares with increasing frequency and firmness that the equalization of opportunity for more abundant living and the necessary care of the handicapped and underprivileged incident thereto is a public responsibility of so great a magnitude as to deserve and receive the undivided attention

of all branches of government; Federal, state and county. It is evidence of this public mandate that the Congress of the United States in August, 1935 passed the National Social Security Act, defining not only the terms under which the government of the United States would meet its public assistance obligations, but also the conditions under which it would extend its financial support to other governmental agencies acting in the various public assistance fields defined in the national act. *Among the provisions of the national enactment was an outline under which the several states might integrate their public assistance programs into a uniform, nation-wide administration thereby establishing a more equitable distribution of assistance and assuring a more uniform administration of all phases of social security.* The State of Washington has sought continuously to fulfill its complete responsibility to its people through compliance with all social security legislation.

"So effective has the integration of social security activities by the Federal government proved to be that we now declare the advisability of extending similar cooperative relationships into the political subdivisions of the state itself. The creation of such relationships under the present statutes is hampered by legal impediments and by lack of necessary authorizations. It is to remove those restrictions and to establish a single administrative agency which will preserve local autonomy in its administration yet retain the state-wide supervision necessary to equity, uniformity, *and the adherence to rules and regulations of the Federal government* that we do create, define, and establish the public assistance administration hereinafter provided."

The idea suggested by the latter part of the foregoing quotation is further emphasized by § 5 of chapter 180, p. 700:

*"Administration of public assistance under this act shall conform with such specific acts* as have been enacted by the legislature *and the Congress of the United States with respect to public assistance* for children, for needy blind, *for needy aged,* and others in-

cluding the allocation of Federal grants in aid to states whose plans for conducting such services are approved by the Federal government and shall conform with the laws of the State of Washington, and such rules and regulations as are vested in the director of social security in relation to all other public assistance.

"The technical administration of all public assistance functions shall be vested in persons whose qualifications have been certified in manner hereinafter provided." Rem. Rev. Stat. (Sup.), § 10007-105 [P. C. § 6233-57].

It appears, then, beyond all question that the legislature of 1937 intended to set up a social security system in this state which should be a part of a "uniform nation-wide administration" and one to be administered in such a manner as to entitle the state to receive the Federal grants provided in the national social security act. I again emphasize that it is declared in the preamble to chapter 180 that one of the reasons for setting up a single administrative agency (the state department of social security) was to insure "adherence to rules and regulations of the Federal government," which is, of course, through its social security board, the controlling authority of the "uniform nation-wide administration" of which our state department was made an integral part. It being amply demonstrated that the legislature directed that our state social security department should be administered in accordance with the Federal theory, and, indeed, in adherence to the rules and regulations of the Federal government, we must, of course, consider the theory and practice of the Federal government in order to determine what the legislature actually intended and directed our state department to do.

First, as to the theory underlying the "uniform nation-wide administration." As to this, for the sake of brevity, I shall simply make a somewhat categorical

statement and cite authority for it. The Federal social security act, from its very inception, contemplated, not a nation-wide integration of state old-age pension plans insuring payments as a matter of right, but a nation-wide integration of state old-age assistance plans, in which payments made to the beneficiaries should be proportionate to their actual current need, and in the determination of which need account should be taken of support by relatives. See Social Security in America by the Social Security Board, Washington, D. C., a government publication available in our state library and copies of which may be secured from the United States government printing office. I cite particularly chapters X and XI, dealing with the formation of the national plan for old-age security and the old-age provisions of the Federal security act. As to the matter of support by relatives, see Paragraph (g), 193.

On p. 194 of that work is a statistical table giving the estimated amounts which it is anticipated that the Federal government will be required to contribute with respect to the old-age assistance section of the integrated nation-wide administration: In 1938, $268,-700,000; in 1939, $348,200,000; in 1940, $418,100,000, and so on, on a constantly increasing scale until 1980, for which the estimate is $1,294,300,000. Among the reasons given for this expected increase is one which, in the light of the holding of the majority, may be regarded as prophetic. I quote:

"The assurance of an old-age assistance grant in case of need tends to produce the reaction in the minds of many persons that the assistance grant is available in old age as a matter of right."

It *has,* unfortunately, produced that reaction in the minds of the majority.

I cite also Report No. 628, Calendar No. 661 of the Senate of the United States. This is the report of the

Senate finance committee, of which Senator Harrison was chairman, recommending the passage of the social security act. I quote briefly from p. 4:

"Of all men and women over 65 at least one-half are financially dependent upon others. The great majority of these are now being assisted by their children, other relatives, or friends. *We think that children who are able to do so should continue to support their aged parents and the legislation which we are proposing is framed with this thought in mind.*"

Since Title I of the act, the title which has to do with old-age assistance, was subsequently passed, as proposed and recommended by Senator Harrison's committee, without any material amendment, it was, therefore, not only framed with that thought in mind, but also enacted by Congress with that thought in mind.

So much for the theory and intent of the Federal act. I come now to the practice of the Federal authorities with which our department of social security, as an integral part of the "uniform nation-wide administration," was, by chapter 180, so plainly and definitely directed to comply. I shall not here resort to quotation of rules and regulations, but to the more direct and more convincing method of citing an actual instance of their enforcement:

On March 2, 1938, the Federal social security board suspended further grants to the state of Oklahoma. Its official press release of that date gave a number of reasons for the action taken, and, among them, the following:

"*Failure of the State Public Welfare Commission to establish definite policies as to the determination of need, support by relatives* and evaluation of property and insurance, combined with lack of adequate investigation and follow-up, *has encouraged a general misconception of the program as one providing pensions*

*regardless of need, rather than assistance according to individual need."*

I now quote from the official finding of fact of the board upon which the above press release was based. The following is paragraph A, under the heading "Inefficient Methods of Administration":

"The Commission's failure to establish clearly defined policies and to maintain them consistently has resulted in the State staffs and the County Assistance Boards not being adequately supervised and instructed. *This lack of clarity is particularly true with respect to the Commission's bulletins relating to the determination of need, support by relatives and the evaluation of property and insurance. The lack of definite policies in these matters, combined with loose practices in making first investigations and failure to make reinvestigations, as provided in the State plans, has encouraged a general misconception that the program is one providing pensions regardless of need, rather than assistance according to individual need."*

I also quote paragraph M, under the same heading:

"The success of the State public assistance plans depends upon the thoroughness and accuracy of investigations and reinvestigations of the need and eligibility of recipients. Unless these operations are accurate and thorough, many persons in need will not be placed upon the rolls; persons not in need will be placed upon the rolls, and grants to those in need will not be adequate. *If reinvestigations are not regularly and accurately made, persons whose circumstances have changed* due to the securing of employment, *support of relatives,* inheritance, or death, et cetera, *will no longer need assistance payments and yet will continue to receive public funds which are intended only for those who are without the necessities of life.* Continued payments to those who were originally in need but have since become ineligible lessens the ability of the State to meet its responsibility to those who are now in need."

What can the italicized language in the foregoing quotation mean, other than that it is the duty of a state

department of social security, integrated in the "uniform nation-wide administration"—if it is to receive, and continue to receive, Federal grants—to continually follow up recipients, and, if their actual needs decrease or cease, due to having received *support from relatives,* to decrease the payment or cut it off entirely so that they may not receive public funds intended only for those who are without the necessities of life?

It cannot be disputed that chapter 180 of the Laws of 1937 integrated our social security department into a "uniform nation-wide administration" and directed it to adhere to "rules and regulations of the Federal government;" nor, as I have shown, that the rules and regulations of the Federal government require the test of actual current need, and that, in fixing the amount of payments, or whether any shall be made, support by relatives must be taken into account. Suppose it be conceded, for purposes of argument, *but for that purpose only,* that the majority have correctly interpreted chapter 156 as providing for pensions regardless of actual need and without respect to support received from relatives. That is not merely inconsistent with chapter 180. It is directly contrary to it. Yet, as late as February of this year, each and every member of this court subscribed to the following declaration contained in the opinion in the case of *State ex rel. Shomaker v. Superior Court,* 193 Wash. 465, 76 P. (2d) 306:

"Since the later of the two conflicting statutes, namely chapter 180, Laws of 1937, contains an emergency clause, that statute controls in so far as chapter 156, Laws of 1937, is inconsistent therewith."

I think that I might, with confidence, rest the dissent at this point. The opinion of the majority, if it becomes the law, will, however, be fraught with such appalling consequences to the actually needy aged of

this state that nothing which might conceivably aid in averting such consequences ought to be neglected or left unsaid.

I do not concede that the majority correctly interprets the legislative intention in passing chapter 156. The interpretation given by the majority is not only inconsistent with chapter 180, but is, in fact, inconsistent with chapter 156 itself. I quote § 12 of that chapter:

"The state hereby *accepts* the provisions of that certain act of the Congress of the United States entitled, An Act to provide for the general welfare by establishing a system of Federal old-age benefits, and by enabling the several states to make more adequate provisions for aged persons, blind persons, dependent and crippled children, maternal and child welfare, public health, and the administration of their unemployment compensation laws; to establish a Social Security Board; to raise revenue; and for other purposes, and such other act with like or similar objects as may be enacted."

Note that it is said "The state hereby accepts" the provisions of the Federal act. But the Federal act did not contemplate grants to the states in aid of plans providing for pensions as a matter of right and regardless of actual need, but only grants in aid of old-age assistance plans wherein the relief should be afforded according to the actual current need of the individual. We must attribute to the legislature, when it passed chapter 156 in March, 1937, full knowledge of the aims and purposes of the Federal act, for that act was passed on August 14, 1935, and had, therefore, been in existence and under administration for more than a year and a half. We must conclude that, in accepting the provisions of the act, in order to secure the consequent Federal funds, it intended to direct that those funds should be used for the purposes granted and for

the beneficiaries intended, and no other, unless indeed, we attribute to the legislature an intention to hoodwink the Federal government. Such an ungenerous thought cannot be seriously entertained and is in no way justified by the language of the state statute.

That portion of the Federal social security act, which provides for "grants to the states for old-age assistance," begins as follows:

"For the purpose of enabling each State to furnish financial assistance, as far as is practicable under the conditions in such State, to aged *needy individuals,* there is hereby authorized to be appropriated . . ." 42 U. S. C. A. (Sup.), § 301.

As I have heretofore shown, this was construed by the framers of the act, and announced by the finance committee of the United States Senate when it recommended it for passage, as contemplating financial assistance to persons in actual need, in the determination of which need support by relatives should be taken into account.

Our statute (Rem. Rev. Stat. (Sup.), § 9998-2), reads, in part, as follows:

" . . . every person residing in the State of Washington, *if in need,* shall be entitled to old-age assistance from the state."

Since I am unable to see how the words *"persons in need"* can describe a larger class than the correlative words in the Federal statute, *"needy individuals,"* I can see no reason for supposing, much less holding, that our legislature intended to include a larger or different class of beneficiaries than was contemplated by the Federal act, and especially so when it admitted that our own statute was passed with the express purpose of dovetailing with, harmonizing with, and complementing, the Federal act.

I come now to the so-called unanswerable argu-

ment. It is argued that it must be concluded that the legislature intended that no account should be taken of the fact that an applicant for old-age assistance is receiving support from relatives because—it is said—it repealed former statutes requiring relatives, if able to do so, to support the aged members of their families. The repeal referred to is contained in § 22 of chapter 180, p. 709. This section is as follows:

"In order to make it possible for the department and the local administrative units to administer public assistance in harmony with the Federal government, sections nine thousand nine hundred and eighty-one (9981) to nine thousand nine hundred and eighty-four (9984) inclusive, and sections nine thousand nine hundred and eighty-seven (9987) to nine thousand nine hundred ninety-one (9991) inclusive, Remington's Revised Statutes of the State of Washington are hereby repealed."

I repeat that it cannot be disputed that the Federal government, which directs and controls the "uniform nation-wide administration," of which our own social security department is an integral part, requires that, in such administration, family support *shall* be taken into account. The majority hold that the state statutes show that the legislature intended that it should not be taken into account, and point directly to the repeal clause in § 22 as necessitating that conclusion. Yet, that section says:

"In order to make it possible for the department and the local administrative units to administer public assistance in harmony with the Federal government, sections [certain specified sections of the state statutes] are hereby repealed."

We have, then, a situation where the legislature says, in the most direct manner, that it repeals the former laws in order to achieve harmony within the "uniform nation-wide administration," and the majority say that it is plain from the rest of the section

that it actually intended quite the contrary. I see no reason to suspect the legislature of dissimulation.

Why do the majority not accept the plain language of the introductory part of § 22 as an honest declaration of legislative purpose and intention? I venture to suggest that it may be because it was reiterated over and over again on the two occasions when the court heard oral argument in this cause, that § 22 took away, by repeal, the legal right of an aged person to require his son, daughter, or other relatives to support him, if able to do so. That is not true. Upon examination of the repealed sections, it appears that the so-called unanswerable argument is founded upon a wrong premise, and is, after all, no argument at all.

Section 22 expressly repeals §§ 9981 to 9984, inclusive, and §§ 9987 to 9991, inclusive, of Remington's Revised Statutes. These sections constitute the bulk of the chapter entitled "Paupers." Sections 9981 and 9982 are as follows:

"The board of county commissioners of the several counties of this state are hereby vested *with entire and exclusive superintendence of the poor in their respective counties:* Provided, that this section shall not be so construed as to include any incorporated city or town having by its charter any of the powers enumerated in said section."

"Every poor person who shall be unable to earn a livelihood in consequence of bodily infirmity, idiocy, lunacy, or other cause shall be supported by the father, grandfather, mother, grandmother, children, grandchildren, brothers, or sisters of such poor person, if they or either of them be of sufficient ability; and every person who shall fail or refuse to support his or her father, grandfather, mother, grandmother, child, grandchild, sister, or brother, when directed by the board of commissioners of the county where such poor person shall be found, whether such relative reside in the county or not, shall forfeit and pay to the county, for the use of the poor of their county, the sum of thirty

dollars per month, *to be recovered in the name of the county commissioners for the use of the poor as aforesaid,* before any justice of the peace or any court having jurisdiction: Provided, that when any person becomes a pauper from intemperance or other bad conduct, he shall not be entitled to any support from any relation except parent and child."

Section 9983 merely establishes the order in which the various relatives may be sued.

Section 9984 is as follows:

"When any poor person shall not have relatives in any county in this state, as are named in the preceding sections, or such relatives shall not be of sufficient ability, *or shall fail or refuse to maintain such pauper, then the said pauper shall receive such relief as the case may require, out of the county treasury,* and the county commissioners may either make a contract for the necessary maintenance of the poor, or appoint such agents as they deem necessary to oversee and provide for the same."

Section 9987 merely defines the length of residence in the county required to qualify a pauper to call upon the commissioners for relief.

Section 9988 provides that, in such matters, one commissioner may act in the absence of his co-commissioners.

Section 9989 provides that, when it is found that an applicant for relief has not resided in the county for six months, the commissioners may give him notice to depart therefrom forthwith.

Section 9990 provides that, after a pauper has received such a notice, he shall not be entitled to any relief from the county which gave the notice.

Section 9991, the last of the statutes repealed, reads as follows:

*"The board of county commissioners of any county in this state may, if they think proper, cause to be built or provided in their respective counties workhouses for*

*the accommodation and employment of such paupers
as may from time to time become a county charge; and
said workhouses and paupers shall be under such rules
and regulations as said board of commissioners may
deem proper and just.* If any person shall bring and
leave any pauper in any county in this state wherein
such pauper is not lawfully settled, knowing him to be
a pauper, he shall forfeit and pay the sum of one hun-
dred dollars for every such offense, to be sued for and
recovered by and to the use of such county, in a civil
action before any court having jurisdiction of the
same."

Now, while § 9982 recites that every poor person un-
able to secure a livelihood shall be supported by cer-
tain relatives, it gives him no right to enforce any such
obligation, the purpose of the recital being merely to
furnish a legal basis for a suit by the commissioners of
the appropriate county, not for *his* relief, but for "the
use of the poor." The amount recovered goes into,
and is commingled with, the poor fund. Using this
fund, the commissioners may contract with someone,
on the best possible terms, to support the aged person
(§ 9984), or make him earn his keep in the county
workhouse (§ 9991). But to these things the aged, in-
digent person was entitled whether the commissioners
recover against his relatives or not. The repeal of
these statutes, therefore, took no tangible right away
from the aged person, except that of receiving support
from the county, and it did this only that it might sub-
stitute for that right a newer and more humane system
of relief provided by the *"uniform* nation-wide admin-
istration."

The repeal, however, did mark the victorious cul-
mination in this state of the great crusade of the fra-
ternal order which was referred to in the beginning
of this opinion, because (1) it abolished the exclusive
jurisdiction of the commissioners of the respective

counties over the aged poor (§ 9981); (2) took from the commissioners their authority to provide for the support of an aged person by contract, in case his relatives refused to support him (§ 9984); (3) abolished the requirement of six months' residence in the county as a condition of securing relief (§ 9987); (4) abolished the right of commissioners to drive him, like a stray dog, from county to county (§ 9989), and, above all, (5) took from them the authority to grant him relief by confining him in a workhouse and requiring him to work for his board (§ 9991). In short, the repeal simply cleared the way for the institution of the "uniform nation-wide administration" of poor relief in harmony with the Federal government. That was the purpose of the repeal, as so plainly stated in the introductory part of the repealing section of chapter 180. The repeal was foreshadowed and the necessity for it declared in the preamble of the chapter:

"So effective has the integration of social security activities by the Federal government proved to be that we now declare the advisability of extending similar cooperative relationships into the political subdivisions of the state itself. *The creation of such relationships under the present statutes is hampered by legal impediments and by lack of necessary authorizations. It is to remove those restrictions and to establish a single administrative agency which will preserve local autonomy in its administration yet retain the state-wide supervision necessary to equity, uniformity, and the adherence to rules and regulations of the Federal government that we do create, define, and establish the public assistance administration hereinafter provided.*"

The duties and powers of the commissioners of the various counties under the new system of poor relief, substituted for the one which was abolished by the repeal, that is, the "necessary authorizations," are set out in a number of sections of chapter 180, and, particularly, in § 7, p. 702, which begins as follows:

"It shall be the duty of each board of county commissioners to serve as an administrative board for all matters involving public assistance to their respective counties and as such to, [etc.] . . ." Rem. Rev. Stat. (Sup.), § 10007-107 [P. C. § 6233-59].

At the time the legislature passed the 1937 series of social security acts, it had accurate information as to the number of persons in the state of Washington, sixty-five years of age and over, who were unable to support themselves. In December, 1936, 36,200 such persons were receiving public assistance under the then existing law, but there were 39,750 others who were not receiving such assistance because they were being supported by their friends and relatives. The amount of the appropriation made for old-age assistance alone shows that the legislature could have had no intention of caring for this second group at the public expense. Even with the addition of the Federal grants, the legislative appropriation has proven scarcely sufficient to take care of the first group. In August of this year, the department, using approximately one-twenty-fourth of the funds provided for the biennium for old-age assistance, was able to make payments to 36,466 persons, but only 6,052 of these, or seventeen per cent, received the thirty-dollar maximum. The others received various lesser sums down to five dollars. For example, 4,034 received $25; 7,666 received $20; 1,718 received $15.

These lesser amounts are, for the most part, though not wholly, accounted for by the fact that, in fixing them, the director took family support into account; that is, he followed the rules of the Federal system, as I have hereinbefore shown he was specifically directed to do. The majority say he should not have done so, but that he should have allowed the maximum amount in all such cases. They say also that the legislature

intended that the additional and greater class of 39,750 persons who have been paid nothing should receive payments in the full maximum sum of thirty dollars per month. That the appropriation made by the legislature was not even half sufficient to carry out such a plan, is a more than conservative statement.

I have hereinbefore said that the majority opinion is fraught with appalling consequences to the actual needy old people of the state, that is, to those who have no relatives who are able to contribute to their support. So strong a statement requires explanation and justification.

In the first place, the majority opinion will require the director to reclassify his present rolls and move the great majority of the present recipients into the maximum payment class.

In the second place, it will add to the list numbering 36,466, as of August last, another and even greater list of eligible persons, 39,750 in number, all of whom, according to the majority opinion, are entitled, *as a matter of right,* to the maximum payment of thirty dollars per month. Of course, not all of these persons will apply for that relief. Some will be deterred by family pride. The sons and daughters of others will, no doubt, continue to honor their fathers and mothers by paying obedience to the great commandment which I quoted at the beginning of this opinion, but sooner or later many of these will cease to support their aged relatives when they realize that they are themselves taxed to support the aged relatives of their equally well-to-do, or wealthier, neighbors.

In the third place, while the need for funds will probably be more than doubled, the supply will at the same time be cut in two, for I think there can be no doubt whatever that, when the majority opinion is announced, the Federal social security board will cut off

all further grants to the state of Washington. How can it do otherwise? It cannot legally certify money out of the treasury of the United States to be expended according to the order and direction of this court. It can only legally certify money out of the Federal treasury to be expended for the purposes for which it was appropriated, and at the discretion of the duly constituted supervising agencies of the "uniform nation-wide administration."

Until the legislature has the opportunity (assuming that it will have the ability) to supply the vast sums necessary for the purpose of making the payments required and directed by the majority opinion, those payments will have to be made out of such state funds as are on hand, unmatched (in my opinion) by Federal grants. This will mean that only very nominal payments can be made to anyone. Any payments, no matter how trifling, that the class, newly qualified by the majority opinion, may receive, will, of course, be to them clear gain, but every dollar of such payments will be received at the expense of the old people who have no relatives able to contribute to their support and who are in dire and actual need. Their payments will, at least for the time being, be cut below the standard of existence.

I am firmly of the opinion that, if this debacle occurs, it will be the fault of the majority, and not that of the legislature. The entire series of social security acts of 1937 were passed to secure the benefits of the act of Congress of August 14, 1935; that is, to secure the Federal assistance grants. The legislature at least clearly understood that the price of membership in the "uniform nation-wide administration" and the right to participate in the Federal grants was that the states should adhere to the Federal rules and regulations. The Federal act did not contemplate that grants

should be made in aid of old-age pension plans, but only in aid of old-age assistance plans, such assistance to be rendered in accordance with current, actual need. The majority say, however, that the legislature actually adopted an old-age pension plan, and direct that it forthwith be put into effect. I cannot subscribe to that without believing one of two things, either that the legislature acted in ignorance of the purposes of the "uniform nation-wide administration," in which it integrated our state social security department, or that it was so dishonest as to attempt to defraud the Federal government and our sister states; for, in chapter 180, which we have unanimously held to be the master and controlling act of the series, the legislature expressly directed the department, its director, and its county administrative units to adhere to rules and regulations of the Federal government. It must have realized that the Federal authorities would rely upon that direction.

I am unwilling to believe—indeed I can find no ground to even suspect—that the legislature acted either ignorantly or dishonestly, and I, therefore, emphatically dissent from the opinion of the majority.

STEINERT, C. J., and SIMPSON, J., concur with ROBINSON, J.