[Nos. 28637, 28626, 28627. *En Banc.* July 7, 1942.]

JAMES R. MORGAN, *Respondent,* v. THE DEPARTMENT OF SOCIAL SECURITY, *Appellant.*

LAURA M. CAMFIELD, *Appellant,* v. THE DEPARTMENT OF SOCIAL SECURITY, *Respondent.*

WILLIAM L. JACOBSON, *Appellant,* v. THE DEPARTMENT OF SOCIAL SECURITY, *Respondent.*[1]

[1] Reported in 127 P. (2d) 686.

*Ralph L. J. Armstrong,* for appellants Camfield and Jacobson.

*John Caughlan,* for respondent Morgan.

*The Attorney General, Phil H. Gallagher, R. C. Finley,* and *Pat Guimont, Assistants,* for Department of Social Security.

*Hyland, Elvidge & Alvord, amici curiae.*

BEALS, J.—James R. Morgan, Laura M. Camfield, and William L. Jacobson, being needy persons, were, prior to December, 1940, receiving from the state monthly allowances by way of what was popularly referred to as old-age pensions. After the effective date of initiative measure No. 141, passed by vote of the people November 5, 1940, proclaimed by the governor December 5, 1940, and printed as chapter 1, p. 3, Laws of 1941

(Rem. Supp. 1941 § 9998-34 *et seq.*), the three persons above named, each already receiving relief as a needy person, were considered as applicants for senior citizen grants, according to the provisions of the act above referred to, and were each awarded such a grant, Mr. Morgan on recommendation of the Jefferson county welfare department, Mrs. Camfield and Mr. Jacobson on recommendation of the Thurston county welfare department, the grants to date from March 1, 1941.

The three recipients, being dissatisfied with the amount of the grants made, appealed to the director of social security, who sustained the department in the grants made to Mr. Morgan and Mrs. Camfield, the director increasing the grant to Mr. Jacobson. The three recipients then appealed to the superior court for Jefferson and Thurston counties, respectively.

On Mr. Morgan's appeal, the superior court for Jefferson county held that the deductions made by the department from the forty dollar base, as resources enjoyed by Mr. Morgan, were improperly made, reversed the decision of the director, and remanded the matter to the department, with directions to increase the grant in accordance with the judgment, and to make the grant effective from December 4, 1940. The court allowed an attorney's fee of three hundred dollars. From this judgment, the department of social security of the state of Washington has appealed.

The superior court for Thurston county, on the appeals of Mrs. Camfield and Mr. Jacobson, affirmed the decision of the director, and, from the judgments entered in the two appeals, Mrs. Camfield and Mr. Jacobson have appealed.

By stipulation of the parties, the stipulation having been approved by the chief justice, joint briefs have been submitted by Mr. Morgan, as respondent, and Mrs. Camfield and Mr. Jacobson, as appellants, the

questions presented in the three cases being practically identical. The attorney general, on behalf of the department, has filed one brief in the three cases. We treat the cases as having been consolidated for argument before this court, the questions presented are practically identical, and we shall consider the three appeals together.

When we desire to refer to Mr. Morgan, Mrs. Camfield, and Mr. Jacobson jointly, we shall refer to them as the recipients. The department of social security will be referred to as the department.

The department awarded Mr. Morgan a senior citizen grant in the amount of twenty-one dollars per month, the department in his case making deductions from the normal assumed standard of forty dollars per month, as follows: Twelve dollars by reason of the fact that Mr. Morgan occupied a dwelling without expense to himself; $1.50 because Mr. Morgan was able to procure water without payment; and six dollars because he was not required to pay for fuel.

Mrs. Camfield was by the department awarded twenty-nine dollars per month, eleven dollars being deducted from the normal forty dollars, due to the fact that she and her husband lived together in a home owned by her, free and clear of encumbrance, and had free water available for household purposes.

The first award made to Mr. Jacobson by the department was in the amount of eight dollars per month, deductions having been made on account of free housing and other items which the department held to be resources which he enjoyed. May 1, 1941, Mr. Jacobson's grant was increased by the department to twenty dollars per month. Upon his appeal, the director reversed the decision of the department, and increased Mr. Jacobson's grant to thirty dollars per month, effective May 1, 1941, holding that the only deductions

which should be made were six dollars on account of a saving available to Mr. Jacobson by reason of the fact that he was residing with relatives, and the further item of four dollars because of income which Mr. Jacobson was receiving.

Appellant department assigns error upon the judgment of the superior court for Jefferson county, in that the judgment set aside the grant to respondent Morgan, and directed that the same be increased, and be effective as of December 4, 1940, instead of as of March 1, 1941. Error is also assigned upon the ruling of the trial court admitting certain evidence over the department's objection.

No specific assignments of error are contained in the brief filed by appellants Camfield and Jacobson, but manifestly these appellants contend that the superior court for Thurston county erred in refusing to enter judgments directing that the grants be increased.

Recipients are needy persons, and entitled to grants of the class which they received. The questions to be determined involve the amount of the grants and the date from which the grants should be effective. Recipients argue that they are entitled to grants fixed in accordance with the specific provisions of initiative 141, contending that, in making their grants, the department has in certain particulars disregarded this statute and violated its provisions, to the detriment of recipients.

The title to the act reads in part as follows:

"An Act providing a minimum of $40 monthly to senior citizens over the age of 65 years; defining incomes; naming eligibility; conforming state and federal matching funds and age limit; . . ."

The "declaration of intent" of the act is found in § 2

thereof, the third and fourth paragraphs of that section reading as follows:

"Although a uniform national pension of prosperity proportions, based on the principles embodied in the Townsend and General Welfare Bills, awarded as a matter of right, not need, is the only adequate and just kind of a pension, until such a pension is won it still remains the duty of the State of Washington at least to take full advantage of the maximum in matching funds that the Federal Government is willing to provide under the Federal Social Security Act, for those without resources and income.

"It is therefore hereby declared to be the intention of this measure to provide for Washington's Senior Citizens over sixty-five as liberally as is possible under the terms of the Federal Social Security Act for securing matching funds." (Rem. Supp. 1941 § 9998-35.)

Section 3 defines certain terms used in the act, the following definitions pertinent to this inquiry being found in two subparagraphs, as follows:

"(g) 'Income' shall mean regular or recurrent gains in cash or kind, excepting therefrom:

(1) The value of the use or occupancy of the premises in which the applicant resides.

(2) Foodstuffs, livestock, fuel, light or water produced by or donated to applicant or applicant's family exclusively for the use of applicant or applicant's family.

"(h) 'Resources' shall mean any property which the applicant owns legally or beneficially, excepting therefrom:

(1) The ability of relatives or friends of the applicant to contribute to the support of the applicant.

(3) The homestead, home or place of residence of applicant or the spouse of applicant.

(6) Foodstuffs, livestock, fuel, light or water produced by the applicant, applicant's spouse or family, exclusively for the use of applicant or applicant's family." (Rem. Supp. 1941 § 9998-36.)

Other sections of the act read as follows:

"Sec. 4. ELIGIBILITY. Senior Citizen Grants shall be

awarded to any person who is without resources and who:

"(a) Has attained the age of sixty-five.

"(b) Has a yearly income which is less than $480 and a monthly income which is less than $40: *Provided,* That if Federal contributions to Senior Citizen Grants are made payable in excess of $20 per month any applicant shall be eligible whose yearly income is less than twenty-four times the maximum monthly Federal contribution, or whose monthly income is less than twice the maximum monthly Federal contribution." (Rem. Supp. 1941 § 9998-37.)

"Sec. 5. How AND WHEN GRANTS SHALL BE PAID. Senior Citizen Grants shall be awarded:

"(a) To each eligible applicant sixty-five years of age or over in the sum of not less than $40 per month on a uniform state-wide basis, minus the income of applicant from other sources: *Provided,* That in the event Federal matching funds shall be available in excess of $20 per month per person, the grants shall be increased to not less than twice that amount, minus the income of applicant from other sources.

"(b) If the Federal government lowers the age limit at which matching funds will be granted for old age grants, then and in that event the state shall award Senior Citizen Grants of at least twice the maximum Federal funds available per person per month to all eligible above the age as established by the Federal government, such grants to be awarded on the terms and conditions as provided for in section 5, subsection (a).

"(c) Upon approval of an application, the grant shall be paid as of the date of application." (Rem. Supp. 1941 § 9998-38.)

"Sec. 9. COURT APPEALS. In the event the applicant feels himself aggrieved by the decision rendered in the hearing provided for in the foregoing section, he shall have the right to appeal to the superior court of the county of his legal residence, which appeal shall be taken by a notice filed with the clerk of the court and served upon the director either by registered mail or by personal service within sixty (60) days after the deci-

sion of the department has been affirmed or modified as provided in the foregoing section. Upon receipt of the notice of appeal, the clerk of the superior court shall immediately docket the cause for trial and no filing fee shall be collected of the applicant.

"Within ten (10) days after being served with a notice of appeal, the director of the Social Security Department shall file with the clerk of the court the record of the case on appeal, and no further pleadings shall be necessary to bring the appeal to issue.

"The applicant and the director shall have the right to present any additional evidence which the court shall deem competent, relevant or material to the case. The superior court shall decide the case on the record, and on any evidence introduced before it. The court may affirm, modify or reverse the decision of the director and fix the amount of assistance to which the applicant shall be entitled under this act. Either party may appeal from the decision of the superior court or the supreme court of the state, which appeal shall be taken and conducted in the manner provided by law or by the rules of court applicable to civil appeals: *Provided, however,* That no bond shall be required on any appeal under this act. In the event that either the superior court or the supreme court renders a decision in favor of the applicant, said applicant shall be entitled to reasonable attorney's fees and costs. If a decision of the director or of the court is made in favor of an applicant who has appealed, assistance shall be paid from the time of application." (Rem. Supp. 1941 § 9998-42.)

"Sec. 10. RULES AND REGULATIONS. The department is hereby authorized to make rules and regulations not inconsistent with the provisions of this act to the end that Senior Citizen Grants may be administered uniformly throughout the state, and that the spirit and purpose of this act may be complied with. Such rules and regulations shall be filed with the Secretary of State thirty (30) days before their effective date, and copies shall be available to the public upon request." (Rem. Supp. 1941 § 9998-43.)

"Sec. 21. UNCONSTITUTIONALITY OF ONE SECTION SHALL NOT AFFECT OTHERS. If any portion, section or

clause of this act shall for any reason be declared unconstitutional, invalid or not in accordance with the provisions of the Federal Social Security Act, such adjudication shall not affect the remainder of the act." (Rem. Supp. 1941 § 9998-54.)

"Sec. 22. REPEALING ACT IN CONFLICT. All acts or parts of acts in conflict herewith are hereby repealed." (Rem. Supp. 1941 § 9998-55.)

"Sec. 23. This act is necessary for the preservation of the public peace, health and safety, the support of the state government and its existing institutions." (Rem. Supp. 1941 § 9998-56.)

"Filed in the office of the Secretary of State January 11, 1940.
"Passed by vote of the people November 5, 1940, at the general election.
"Proclamation signed by the Governor December 5, 1940."

The following portions of the constitution of the state of Washington should be noted:

Art. I, § 12. "No law shall be passed granting to any citizen, class of citizens, or corporation, other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations."

Art. II, § 1, as amended by amendment VII, refers to measures initiated by the people and reads:

"(d) . . . Such measure shall be in operation on and after the thirtieth day after the election at which it is approved."

Art. VIII, § 5. "The credit of the state shall not, in any manner, be given or loaned to or in aid of any individual, association, company, or corporation."

The Federal social security act (49 Stat. 620) is found in 42 U. S. C. A. (Sup.) § 301 *et seq.* The following portions of the act should be considered in connection with the questions here presented:

"§ 301. Appropriation. For the purpose of enabling each state to furnish financial assistance as far as practicable under the conditions in such state, to aged needy individuals, there is hereby authorized to be appropriated . . . The sums made available under this section shall be used for making payments to states which have submitted, and had approved by the Social Security Board established by section 901 of this chapter . . . , state plans for old-age assistance. (Aug. 14, 1935, c. 531, Title 1, § 1, 49 Stat. 620.)"

"§ 302. State Old-age Assistance Plans; Contents; Approval by Board. (a) A state plan for old-age assistance must (1) provide that it shall be in effect in all political subdivisions of the state, and, if administered by them, be mandatory upon them; (2) provide for financial participation by the state; (3) either provide for the establishment or designation of a single state agency to administer the plan, or provide for the establishment or designation of a single state agency to supervise the administration of the plan; (4) provide for granting to any individual, whose claim for old-age assistance is denied, an opportunity for a fair hearing before such state agency; [the following subsections are amendatory, as amended Aug. 10, 1939, c. 666, Title 1, § 101, 53 Stat. 1360] (5) provide such methods of administration . . . as are found by the Board to be necessary for the proper and efficient operation of the plan; . . . (7) effective July 1, 1941, provide that the state agency shall, in determining need, take into consideration any other income and resources of an individual claiming old-age assistance; . . . [The act did not direct that the state agency take other income and resources into consideration.]

"(b) The Board shall approve any plan which fulfills the conditions specified in subsection (a), except that it shall not approve any plan which imposes, as a condition of eligibility for old-age assistance under the plan—

"(1) An age requirement of more than sixty-five years, . . .

"(2) Any residence requirement which excludes . . .

"(3) Any citizenship requirement which excludes
. . ."

"§ 304. STOPPING PAYMENT ON DEVIATION FROM RE-
QUIRED PROVISIONS OF PLAN OR FAILURE TO COMPLY
THEREWITH. In the case of any state plan for old-age
assistance which has been approved by the Board, if
the Board, after reasonable notice and opportunity for
hearing to the state agency administering or supervis-
ing the administration of such plan, finds—

"(1) that the plan has been so changed as to impose
any age, residence, or citizenship requirement pro-
hibited by section 302 (b), or that in the administra-
tion of the plan any such prohibited requirement is im-
posed, with the knowledge of such state agency, in a
substantial number of cases; or

(2) that in the administration of the plan there is a
failure to comply substantially with any provision re-
quired by section 302 (a) to be included in the plan;
the Board shall notify such state agency that further
payments will not be made to the state until the board
is satisfied that such prohibited requirement is no
longer so imposed, and that there is no longer any such
failure to comply. Until it is so satisfied it shall make
no further certification to the Secretary of the Treasury
with respect to such state."

A transcript of the minutes of the meeting of the
Federal social security board at which initiative 141
was considered, contains the following:

"Section Three, subsections (g) and (h), of this in-
itiative measure are in violation of the provisions of
the Social Security Act, which become effective, July
1, 1941, in that the state agency may disregard certain
'income and resources' in determining whether an ap-
plicant is eligible for old-age assistance; and may also
be in violation of presently effective provisions of
Social Security Act prior to July 1, 1941, since the act
does not allow Federal participation in a plan under
which old-age assistance may be paid to an individual
who is not 'needy;'

"The provisions of section 9 of the initiative measure
are inconsistent with the provisions of the Social Se-

curity Act insofar as they provide that the court may receive additional evidence and establish new factual records as a basis for decisions by the court affecting eligibility and amounts of assistance in individual cases, or that the court may, as therein stated, 'fix the amount of assistance to which the applicant shall be entitled.' "

Under date December 17, 1940, the attorney general of this state rendered to the department a written opinion, a portion of which reads as follows:

"To summarize, it is our opinion that the intention of the people in enacting Initiative 141 was that it should harmonize with the requirements of the Federal Social Security Act, and in keeping with this intention the terms 'income' and 'resources' would have the same meaning as those terms have in Title I of the Federal Social Security Act, namely, their ordinarily understood meanings, and further, section 9 should be construed to confine the courts' authority to exercising appellate jurisdiction only for the purpose of determining whether the department has proceeded within its authority, and has acted neither arbitrarily nor capriciously. Upon the basis of this construction a plan should be formulated by you and submitted to the Social Security Board for approval."

The department's memorandum No. 104, containing rules and regulations for departmental administration, together with procedural instructions, was admitted in evidence, and contains the following:

"The terms 'income' and 'resources' in connection with Senior Citizen Grants shall be given the same meaning as is ordinarily given to them in the administration of public assistance. Income and resources together will include all gains in cash or in kind coming to and available to the applicant. All income and resources, without substantial exception, shall be taken into consideration both in determining eligibility and in fixing the amount of the grant. This will include any and all cash income belonging to or received by the applicant and any regular contribution in cash or in kind received by the applicant."

■ *Amici curiae* have filed a brief, arguing, first, that initiative 141 is unconstitutional and void, and, second, that if the entire act is not void certain sections thereof should be held unconstitutional. In support of the contention that the entire act is void, it is argued that the act purports to benefit private individuals who are not in need. The support of the poor and needy is a recognized public governmental function. If the act by its terms purports to relieve persons not in actual need, it might well be challenged upon constitutional grounds, but while the "declaration of intent," *supra,* contains a statement, *arguendo,* that need is not the only, or the best, basis for an old-age pension, the latter portion of the declaration shows beyond question that the act as drawn operates for the benefit of persons "without resources and income," or upon a basis of need alone. Considering the entire act, we hold that no person who is not in need may be a beneficiary thereunder.

In the case of *State ex rel. Eckroth v. Borge,* 69 N. D. 1, 283 N. W. 521, the supreme court of North Dakota, in considering acts similar in nature to initiative 141, while holding that need was a basic requisite for the receipt of an award under such a statute, held that need was, in fact, the basis for the North Dakota statute, and that the same was not obnoxious to attack upon constitutional grounds.

The argument advanced by *amici curiae,* to the effect that the entire act should be held void as purporting to grant relief to persons described in the act as possible beneficiaries thereunder, upon some basis other than need, is not well founded, and the act cannot be held unconstitutional.

■ *Amici curiae* vigorously attack § 3 (g) and (h), *supra,* contending that several subdivisions of subparagraphs (g) and (h) operate to bring within the

scope of the act, as beneficiaries thereunder, persons who should not be classified as needy, and also operate unequally as between beneficiaries of the act, granting the same relief by way of awards under the act to persons in different degrees of need. It is also argued that these portions of the act cannot be held inoperative and disregarded, without rendering the whole act unworkable, and consequently void. Doubtless, the portions of the act referred to are open to serious criticism, based upon constitutional grounds, but it does not follow that a holding that these subparagraphs are inoperative requires that it be held that the entire act is void, as the act may operate without regard to such subparagraphs.

We shall now consider the respective contentions of the parties to these consolidated actions.

Recipients' main contention is that, in fixing the amount of their respective grants, the department has, without justification, disregarded the statute of the state, and, in violation of that statute, has made unwarranted deductions from the grants. On the other hand, the department contends that in all three cases it was justified in taking into consideration certain resources enjoyed by recipients, or conditions which result in savings to recipients, and that the department's estimated value of such resources and savings is based upon a state-wide average, and is just and reasonable. The department further argues that its plan or system now in effect, under which it is operating, has been approved by the Federal social security board, and that under it the state is obtaining the benefit of the matching of its funds by the Federal government.

As above stated, recipients are needy persons, and entitled to grants under the statute. This has never been disputed. The disputed questions involve the

claims of recipients to grants in larger sums than allowed by the department.

It is evident that there is a conflict between the provisions of the Federal act and those of the state statute. In the portion of the Federal act above quoted is found the following:

"(a) A state plan for old-age assistance must . . . (7) effective July 1, 1941, provide that the state agency shall, in determining need, take into consideration any other income and resources of an individual claiming old-age assistance."

By the portions of initiative 141 above quoted, it is provided in § 3, subparagraph (g), that

" 'Income' shall mean regular or recurrent gains in cash or kind, excepting therefrom:
"(1) The value of the use or occupancy of the premises in which the applicant resides."

By subparagraph (h) of the same section, it is provided that

" 'Resources' shall mean any property which the applicant owns legally or beneficially, excepting therefrom: . . . (3) The homestead, home or place of residence of applicant or the spouse of applicant."

The language of § 3 itself shows that the items which are excepted from income, and thereafter excepted from resources, including the ownership or occupation of a dwelling, are in fact income and resources, the statute providing, however, that such items shall not be considered when computing the amount of grants to persons entitled to the benefit of the act. The state statute, then, provides that certain income or resources shall not be considered, which items the Federal act says shall be considered, in fixing the amount of grants by the state agency which are to be matched by Federal funds.

Under any definition of the word "resource," the right

172

to the use and occupation of a dwelling must be considered as such.

It would seem that recipients' real complaint is that the department has not made every possible effort to claim matching grants from the Federal government upon the most liberal basis conceivable, and has not tested to the utmost the liberality of the Federal social security board in the exercise of its legal authority under the Federal statute, by way of matching state funds or its possible willingness to construe its legal rights as extending beyond its express statutory authority.

In these and companion cases, it is suggested that the department is bound to proceed under the state statute and strictly in accordance with all the terms and provisions thereof, regardless of the possible refusal of the Federal board to continue payment of matching funds to the state.

■ The declaration of intent contained in initiative 141 expressly states that full advantage should be taken of the willingness of the Federal government to provide matching funds under the Federal social security act, the declaration continuing:

"It is therefore hereby declared to be the intention of this measure to provide for Washington's Senior Citizens over sixty-five as liberally as is possible under the terms of the Federal Social Security Act for securing matching funds."

This declaration of intent demonstrates that the act was intended to cooperate with the Federal act, and to be construed in connection therewith.

Section 21, of initiative 141, *supra,* expressly provides that, "if any portion, section or clause" of the act shall be declared not in accordance with the provisions of the Federal social security act, such adjudication shall not affect the remainder of the act. By this provision,

the intent that the act shall accord with the Federal statute is made doubly clear. That initiative 141 is not in accord with the Federal act, cannot be gainsaid.

Recipients argue that this question has never been adjudicated, within the meaning of the statute, and that the burden of proof rests upon the department to establish that such an adjudication has been made, within the meaning of § 21, *supra*. Recipients contend that the action of the Federal board, as shown by the extract from its minutes, above quoted, was *ex parte*, and was not an adjudication, or even a final administrative determination. In support of this contention, recipients submit a lengthy argument based upon a monograph on administrative procedure prepared by "an attorney general's committee," relating to practice before the social security board. Whether or not the action of the Federal board was definitely an administrative adjudication of the matter, and whether or not that board might have again considered the question, if requested so to do, is immaterial. The board did take action upon the matter, and it is not suggested that that action, which amounts to a declaration upon the subject, has ever been changed. The ruling of the Federal board is not subject to criticism as to its reasonableness or legality.

We now hold that § 3, subparagraphs (g) and (h), of initiative 141, are not in accord with the provisions of the Federal social security act, and that the Federal board correctly held that these subparagraphs "are in violation" of that act.

The act contains other references to the Federal social security law, which show clearly that initiative 141 was intended to keep pace with the Federal act and be administered always in view of the Federal act, as the same might from time to time be amended, or as the administration thereof might be changed.

We are convinced that, by its express terms, initiative 141 was intended to be construed in connection with the Federal act, and as to a great extent dependent thereon. It is manifestly the intention of the state act to place the state in a position to avail itself to the full of the benefits of the Federal act, and the state statute negatives the idea that it was the intention of the act that the state proceed upon its relief program independently of the predominant partner, the Federal government, in administering relief funds, or upon any plan or system different from that established by the Federal act.

"The federal and state statutes represent 'a cooperative legislative effort by state and national governments, for carrying out a public purpose common to both, which neither could fully achieve without the cooperation of the other.' *Carmichael v. Southern Coal & Coke Co.,* 301 U. S. 495." *Northwestern Mutual Life Ins. Co. v. Tone,* 125 Conn. 183, 4 A. (2d) 640.

The state department regularly adopted rules and regulations for departmental administration, which were promulgated as provided by law. The grants made to recipients were in accord with these rules. Recipients contend that deductions made by the department on the basic or normal award of forty dollars per month were arbitrary, unlawful, and unreasonable.

Such rules are subject to judicial review, and may be set aside if invalid as contravening some statute, or if found to be arbitrary and capricious, or basically erroneous.

"The validity of an administrative regulation will be judicially determined in any proper case in which an administrative sanction or order, finding, ruling, or any other form of administrative action assailed depends upon the validity of the regulation." 1 Vom Baur's Federal Administrative Law 493, § 496.

It appears that, after the Federal board, under date November 15, 1940, noted its criticism of initiative 141, in the language above quoted, Federal matching funds were withheld from the state of Washington, in so far as initiative 141 was concerned, until March 1, 1941, when the Federal board, having approved the rules and regulations adopted by the state department, resumed payment of such matching funds.

Recipients argue that, if it should be held that the department has the right to adopt and put into effect substitute definitions in place of the statutory definitions contained in initiative 141, the entire act should be held unconstitutional, pursuant to the opinion of this court in the case of *Uhden, Inc. v. Greenough,* 181 Wash. 412, 43 P. (2d) 983, 98 A. L. R. 1181, in which we said:

"Regulations made by executive officers are valid only as subordinate to a legislative policy sufficiently defined by statute, and when found to be within the framework of such policy."

It is, of course, a recognized general principle that the legislature may not delegate to the executive authority the power to make law. The legislative authority, however, may by statute provide that the executive branch of the government shall determine some fact or status, upon the existence of which the application of a law depends.

In the *Uhden* case, we held that the statute, which purported to vest in the executive branch of the government authority to make rules and regulations controlling the production, sale, and disposition of agricultural products, to issue licenses, to fix prices, and to classify basic agricultural commodities, with power to exclude products from the operation of the act, was unconstitutional, as an unlawful delegation of legislative power. The statutory provisions held unconsti-

tutional in the *Uhden* case purported to delegate to executive officers of the state legislative powers. Initiative 141 does not attempt to do this. The *Uhden* case is not here controlling.

In the case at bar, the department has merely followed the directions contained in initiative 141 itself, by disregarding certain provisions of the act, so as to bring the act in harmony with the Federal statute. As to the right of the legislature to enact a statute under which the executive shall determine some fact or status, upon the existence of which the operation of the statute is to depend, the following text, quoted from Crawford on Statutory Construction (1940), § 19, is in point:

"Closely akin to, if not a part of the power to ascertain facts upon which the operation of a law is to depend, is the power to issue a proclamation declaring a specified enactment to be thenceforth, or from a given date, in effect. The same is true with the power to suspend the effectiveness of a given legislative act. Both of these powers, if they be considered separate powers, are frequently delegated to the executive. . . . Upon this same reasoning, the executive or an administrative board may be authorized to suspend the operation of a statute by a proclamation when satisfied with certain facts, although the power to suspend laws is vested solely in the legislature. But the suspension by the executive or by the administrative board, must be based upon some condition, contingency, exigency, or state of facts, declared by the legislature in the enactment to be sufficient to warrant the suspension by the executive. Such an authorization is not considered a delegation of legislative power, since nothing is left to his determination which involves the expediency or just operation of the legislation."

In the case of *Home Owners' Loan Corp. v. Rawson*, 196 Wash. 548, 83 P. (2d) 765, an action to foreclose a real estate mortgage, it was contended that provisions of the Federal statute vesting certain authority in the

plaintiff's board of directors, pursuant to which authority the board had promulgated rules and regulations, were invalid. In discussing this phase of the case, we said:

"Congress may authorize an administrative officer or body to make rules and regulations respecting the administration of the law; and such rules, when so made, have the force of law. 12 C. J. 845.

"The statute under which respondent corporation (an instrumentality of the United States) was created and its board of directors is authorized to function, does no more than permit the administrative board to exercise the discretion vested in it to effectuate the clearly and definitely expressed policy in the statute. It does not constitute legislation."

The rule declared in the case last cited applies to the facts of the case at bar.

In the case of *Tatum v. Wheeless,* 180 Miss. 800, 178 So. 95, the supreme court of Mississippi held, *inter alia,* that the state unemployment compensation law, which by its terms authorized the governor of the state to suspend the operation of the law for not more than six months, if it should transpire that the Federal social security act had been amended, repealed, or declared unconstitutional, was not obnoxious to the objection that the statute delegated legislative functions to the executive. In the course of the opinion, the court stated:

"We are of the opinion that the legislature may fix conditions under which an act may operate, and conditions under which the law may cease to operate, and confide to some suitable agency of the state the determination of the question of fact upon which the operation is to be suspended, or resumed after the passing of such conditions. The legislature itself must fix the conditions, and cannot delegate that function, but it may delegate the fact-finding function, as to whether conditions exist, to such agency."

Initiative 141, considered as a whole, shows beyond question that it was intended to operate in connection with the Federal social security act. The department was correct in preparing rules and regulations for the efficient and equal administration of the statute, and the rules and regulations which were promulgated by the department nowise contravene initiative 141, as construed in connection with the Federal act. The departmental rules and regulations as heretofore adopted are not open to attack upon the ground that any provision thereof is void as matter of law.

Recipients refer to correspondence between the Federal board and agencies of the state of California, in connection with the administration of the law of that state providing for relief of needy persons. This matter is immaterial, in so far as the questions here presented are concerned.

We shall now consider § 9, p. 8, of initiative 141 (Rem. Supp. 1941 § 9998-42), *supra,* providing for judicial review of the departmental action in refusing a grant or allowing one in an amount which the applicant deems insufficient in fact or in law. Section 9, after providing that the applicant and director may present before the superior court any additional evidence which the court deems material, continues:

"The superior court shall decide the case on the record, and on any evidence introduced before it. The court may affirm, modify or reverse the decision of the director and fix the amount of assistance to which the applicant shall be entitled under this act."

The section then provides for an appeal to the supreme court by either party.

*Amici curiae* contend that this section is unconstitutional because it purports to vest the courts with powers which the constitution provides shall pertain exclusively to the executive branch of the state govern-

ment. It is also argued that there should be no judicial review, in the absence of a showing of arbitrary and capricious action by the department. It is vigorously argued that the section provides for the substitution of judicial discretion for that of the executive department of the government, to which administration of the law has been allocated by the legislature.

Apparently, the attorney general agrees with *amici curiae* in the view that the section is obnoxious to attack upon constitutional grounds.

Beyond question, initiative 141 provides for its administration by a subdivision of the executive branch of the government. We find nothing in § 9 which purports to invest the courts with executive functions. The section does no more than provide for review by the courts upon questions of fact and law, which have been determined by the department. If the courts should attempt to exercise executive functions in connection with the administration of the statute, the courts would be undertaking to transcend the powers vested by the statute. Under the act, it is the duty of the judicial department to review departmental orders from which appeals have been taken in accordance with the statute, and determine by the application of appropriate legal principles whether or not the plans, standards, or methods adopted by the department violate some statutory provision because directly contrary thereto, or are in some measure inadequate or unlawful, in that they exceed or restrict the departmental action contemplated by the statute. Such review by the courts does not constitute the exercise of any executive function. To determine whether or not an appellant has been deprived of a statutory right by the department, whether the department has acted by way of the adoption of a general plan or by some de-

cision in a specific case, constitutes a proper matter for judicial review.

The suggestion of possible arbitrary or capricious action on the part of the department is often not essential to a judicial review of such action. An order of the department may be illegal, whether or not the same would be considered arbitrary or capricious. Often where no question of fact is in dispute, the only questions presented are those of statutory application or interpretation. *Zappala v. Industrial Ins. Commission,* 82 Wash. 314, 144 Pac. 54, L. R. A. 1916A, 295.

In the case of *Foster v. Industrial Ins. Commission,* 107 Wash. 400, 181 Pac. 912, this court was called upon to review the action of the commission in fixing the amount of award for a certain injury. This court up-held the action of the department, while holding that under the statute the courts had authority to determine certain questions which might arise. The statute under which the industrial insurance commission was operating differs fundamentally from initiative 141, and cases involving the industrial insurance law are not necessarily in point, but often the reasoning of the court in deciding such cases should be considered in deciding such questions as are here presented.

Section 9 does not purport to vest the courts with administrative functions and is valid.

We shall now discuss the method followed by the department in making grants, including the grants made to respondents.

Chapter 216, p. 864, Laws of 1939 (Rem. Rev. Stat. (Sup.) § 10007-101a *et seq.*) entitled "Public Assistance," relates "to the care, support and relief of needy persons," etc., and deals with classes of social security, with the exception of unemployment compensation. The first portion of the second paragraph of § 17, p. 874, of the act referred to, reads as follows:

"Such assistance may be granted only to such persons as are in need. A person shall be considered to be in need within the meaning of this act who does not have resources sufficient to provide himself and dependents with food, clothing, shelter and such other items as are necessary to afford a reasonable subsistence."

The first sentence of § 5 of initiative 141 reads as follows: "The care, support and relief of needy persons is hereby declared to be a joint Federal, state and county function"; this section also referring to Federal aid assistance.

By § 6, it is provided that "The Department of Social Security shall serve as the single state agency to supervise the administration of public assistance"; that section further defining the duties and powers of the department.

By its memorandum No. 104, the department promulgated its rules and regulations concerning grants of the class with which we are here concerned. This memorandum contains the following:

"In determining the amount of the Senior Citizen's Grant, the following budgetary guide is to be used in evaluating resources:

| | |
|---|---|
| Food | $ 9.00 |
| Fuel | 6.00 |
| Housing | 12.00 |
| Light | 1.50 |
| Water | 1.50 |
| Clothing | 3.00 |
| Incidentals | 5.00 |
| Household replacements | 2.00 |
| | $40.00 |

"Two or more applicants or recipients sharing household expenses will each be considered as having available resources through sharing such household expenses as housing, fuel, light, water, and household replacements.

"The resource in combined living has been determined as follows for each recipient or applicant:

| | |
|---|---|
| Housing | $ 3.00 |
| Fuel | 1.50 |
| Light | .50 |
| Water | .50 |
| Household replacements | .50 |
| | $ 6.00 |

"This $6.00 resource together with other resources available to each recipient or applicant will be deducted from $40. If two recipients or applicants share the home under these circumstances, each will have a $6 resource in combined living. This $6 resource will also be considered in determining the amount of the grant to recipients in old age cooperative homes.

"If two or more recipients or applicants, living in the same home, receive any of the budgetary items at no cost to them, the full amount given in the budgetary guide for these items shall be considered a resource to each such recipient or applicant. This resource, together with any of the remaining resource items in combined living available to the recipient or applicant, will be deducted from $40."

The department, evidently pursuant to § 5 of initiative 141, *supra*, adopted forty dollars per month as the basis from which to estimate the amount of the grant to be made in each individual case.

Recipients contend that the budgetary system which the department adopted contravenes the provisions of initiative 141, and that a grant to a needy person entitled to the benefit of the act must be in the amount of forty dollars per month over and above the need for housing or shelter.

In the case of *State ex rel. Eckroth v. Borge, supra,* the supreme court of North Dakota considered the minimum standards of relief established by the law of that state, and that opinion may well be considered in connection with the question now under discussion.

By § 10, p. 9, of initiative 141, the department is

" . . . authorized to make rules and regulations not inconsistent with the provisions of this act to the end that Senior Citizen Grants may be administered uniformly throughout the state, and that the spirit and purpose of this act may be complied with." (Rem. Supp. 1941 § 9998-43.)

It is, of course, necessary that the act be administered uniformly and equally, without favor or advantage to any person or class of persons. Up to this time, the department has made over sixty thousand grants under the act, and the amount of work required by way of investigation, coordination, etc., is, of course,

enormous. The machinery required to handle such very considerable operations must necessarily be complicated, and involve endless details and adjustments. Such a task, to be successfully accomplished, must be performed by an efficient administrative department of the executive branch of the government. When such a department is functioning honestly, fairly, without fear or favor, and in accordance with the law, the less it is interfered with the better.

In the case of *Taylor v. Industrial Ins. Commission,* 120 Wash. 4, 206 Pac. 973, this court, in considering a classification of injuries and awards, adopted by the then industrial insurance commission, and upholding an award made by the then commission in accordance with its schedule, said:

"Unless we limit the power of interference on the part of the courts with the administration of the industrial insurance act by the body empowered by law to administer it, to a great extent the intent of the law will be defeated."

In the recent case of *Cowiche Growers, Inc. v. Bates,* 10 Wn. (2d) 585, 117 P. (2d) 624, this court quoted from the decision of the supreme court of Connecticut in the case of *Duys & Co. v. Tone,* 125 Conn. 300, 5 A. (2d) 23, as follows:

" 'In the case of a statute of wide application, as is an unemployment compensation act, in its adoption, interpretation, and administration, as well as in determining its validity, it is the general field of its operation and effect which is to be regarded rather than its application to individual exceptional cases, and appropriateness to the general situation is the predominant consideration. *Jeffrey Mfg. Co. v. Blagg,* 235 U. S. 571, 577, 35 Sup. Ct. 167 [59 L. Ed. 364].' "

In the case of *State ex rel. American Telechronometer Co. v. Baker,* 164 Wash. 483, 2 P. (2d) 1099, referring to an order of the then department of public

works, directing a change in the use of mechanical equipment by a public service company, this court said:

"Respondent contends that the findings of the department are not supported by the record, and that this court should hold that the departmental order should, therefore, be vacated. The determination of such questions of fact should rest largely with the department. That is the tribunal provided by law for the determination of such matters as this which involve business, engineering, mechanical, social and economic situations and conditions, and require expert knowledge, careful study and investigation of engineering and mechanical problems which are important in determining questions involving the exercise by public utilities of their normal functions."

These cases arose under different statutes, and involved different administrative departments, but the underlying principles are identical with those in the cases at bar.

Universally, courts are loath to interfere with the work of an administrative department of the state, save in so far as questions of law are involved. In some classes of cases, it is the general rule that departmental orders, based upon administrative discretion, will not be reversed by the courts unless it appears that in making the orders the department acted arbitrarily or capriciously, or proceeded on a fundamentally wrong basis. Of course, if it be contended that an administrative order contravenes, or is not supported by, the statute, it is subject to judicial review.

In the case of *Sweitzer v. Industrial Ins. Commission,* 116 Wash. 398, 199 Pac. 724, this court considered an appeal by the department from a judgment of the superior court reversing a departmental award in favor of an injured workman. The trial court held that an order of the commission was "arbitrary and capricious and not in accordance with the facts and the

law and statutes in such case made and provided." In reversing the judgment of the superior court, this court said:

"The most that can be said of their action, even from the respondent's point of view, is that they erred in judgment. But this is not arbitrary or capricious action. These terms, when used in this connection, must mean wilful and unreasoning action, action without consideration and in disregard of the facts and circumstances of the case. Action is not arbitrary or capricious when exercised honestly and upon due consideration where there is room for two opinions, however much it may be believed that an erroneous conclusion was reached."

It appears from the record that the departmental rules now under discussion were adopted by the department after careful study of administrative procedure, and after due consideration of pertinent facts.

██ We find nothing contrary to the law in the establishment of such a yardstick as the department has set up, referred to herein as its budgetary system, and, indeed, it would seem that some such framework is required in order to establish a necessary equality in the fixing of the grants. Nothing is more important to the efficient and satisfactory administration of such a law as initiative 141 than absolute justice and equality between beneficiaries of the statute. It would seem that such a result may only be accomplished by the adoption of some such scale or budget as that set up by the department.

██ Recipients vigorously attack the department's established budget, as contravening the statute. This phase of the question involves complex administrative problems which are necessarily the subject of negotiations between the department on the one hand and the Federal board on the other. The courts hesitate to interfere with the action of an administrative depart-

ment, when definitely taken upon an important phase of the work which the department has been created to perform, unless it appears that in reaching its determination the department has proceeded upon a fundamentally wrong basis, or has acted arbitrarily or capriciously.

After careful consideration, we find in the record before us nothing which justifies a holding that the carefully worked out plan or system established and followed by the department, and agreed to by the Federal board, should be held erroneous and ordered changed by the judicial department of the state government.

In considering the ownership of a home or an existing right to free living quarters, the department is clearly correct in classifying such as a resource. It would seem difficult to imagine how grants pursuant to the act could be equalized as between beneficiaries who own homes or enjoy free living quarters and those who do not have such an advantage, without in some way recognizing the advantage enjoyed by the former group. As above stated, such a plan would lay the statute open to serious constitutional objections as class legislation. This is also true of other items which the board considers as resources, and which recipients contend should not be so taken into consideration. So long as need is the only constitutional basis for grants under the act, the different and relative needs of beneficiaries must be considered, or the statute will operate unequally as between beneficiaries thereunder. This would be true irrespective of the amount fixed as the basic or normal grant from which the department should proceed as the need appeared.

Recipients bitterly complain of other deductions made by the department in their respective grants. We hold that the department correctly classified the

enjoyment of free fuel, light, and water, as well as the occupation of free living quarters, as resources, and having so correctly classified these items, the department was justified in making a smaller grant to a recipient who enjoyed some or all of such resources than to a recipient who did not enjoy them. Indeed, if the department had not taken such matters into consideration, it might well have been argued that it was acting arbitrarily and capriciously in allowing certain recipients larger amounts than were made to others. We find no item which the department deemed a resource, and took into consideration in fixing the amounts of recipients' respective grants, which was improperly classified as a resource. It cannot be held, then, in these matters that the department proceeded on a fundamentally wrong basis.

 As to the amounts which the department fixed as deductions to be made, respectively, on account of the different resources which the department determined should be taken into consideration in fixing the amounts of grants under the act, we hold, in so far as these items are under attack in these cases, that the department acted well within its discretion; that the amounts were not arbitrarily or capriciously fixed; and that the action of the department should not be changed or reversed by the courts.

 Initiative 141 was approved by the people at the general election of November 5, 1940. Pursuant to Art. II, § 1, subparagraph (d), of our state constitution, as now in force (amendment VII), an initiative measure adopted by popular vote "shall be in operation on and after the thirtieth day after the election at which it is approved." The statute, then, became effective December 5, 1940. Subparagraph (c), of § 5, p. 7, of initiative 141, provides that "upon approval of an application, the grant shall be paid as

of the date of application." (Rem. Supp. 1941 § 9998-38.)

As all the recipients in the case at bar had been receiving old-age assistance from the state of Washington prior to the adoption of initiative 141, they and all others similarly situated were considered as applicants for senior citizen grants under the provisions of the act, and they continued to receive the monthly assistance previously awarded to them until March 1, 1941, when the grants made in their favor pursuant to initiative 141 became effective under the ruling of the department.

January 28, 1941, the Federal social security board approved the state plan submitted by the department, the approval to be effective in so far as the matching of state funds thereunder from the Federal government was concerned to date from March 1, 1941. Federal matching funds, then, were not available to the state to assist in paying grants made pursuant to initiative 141 until March 1st.

Recipients contend, and in the Morgan case the trial court held, that grants made pursuant to initiative 141 should commence from the date the initiative became effective, December 5, 1940, or practically three months before Federal matching funds for grants pursuant to initiative 141 became available.

What we have said above concerning the manifest intention of initiative 141 that it be tied in with, and dependent upon, the furnishing of matching funds by the Federal government, applies with full force to the question now under discussion. The portion of § 5 of the act last above quoted must be construed as intending that grants made pursuant to the act shall be payable only as and when matching funds furnished by the Federal government should become available.

In the case of *State ex rel. Dean v. Brandjord,* 108 Mont. 447, 92 P. (2d) 273, the supreme court of Montana, in deciding several questions which arose under state legislation providing for old-age assistance, used the following language:

"When the whole subject of relief for the aged indigent is taken into consideration, when the history of federal and state legislation is given proper effect, when the national plan and the subsequently enacted state plans of the different states are understood, it would seem that none of the state plans, including our own, were ever devised to stand or operate without the cooperation of the federal government. (Compare *Rutherford v. City of Great Falls,* 107 Mont. 512, 86 P. (2d) 656.) If this be true, and we think that it is beyond question the outstanding theory of the whole matter, then it is obvious that our law must be construed, not as an independent Act, but in conjunction with the federal Act, that is, the two Acts must be administered together as a unified code of laws enacted by Congress and the state legislature for the complete and comprehensive control of the subject."

The department correctly ruled that the grants made in favor of recipients under initiative 141 were payable from March 1, 1941, and not otherwise.

In the Morgan case, the trial court allowed the recipient's attorney a fee of three hundred dollars. By § 9, of initiative 141, it is provided that

"In the event that either the superior court or the supreme court renders a decision in favor of the applicant, said applicant shall be entitled to reasonable attorney's fees and costs." (Rem. Supp. 1941 § 9998-42.)

In view of the fact that the judgment in favor of Mr. Morgan is reversed, we find it necessary to consider the effect of such a reversal upon the allowance of an attorney's fee to Mr. Morgan's counsel. So far as we are advised, it is the universal rule that costs

allowed in a trial court abide the result of an appeal. In Bancroft's Code Pleading, Practice and Remedies, vol. 3 Sup., 2431, § 2101, the rule is stated as follows:

"In legal actions the only party entitled to costs is the one who prevails. He is never required to pay the costs incurred by the unsuccessful party."

In the case of *Stevens v. Central Nat. Bank of Boston*, 168 N. Y. 560, 61 N. E. 904, the court quoted the general rule that the successful party, although he may be denied costs, never pays them.

The court of appeals of California, in the case of *Purdy v. Johnson*, 100 Cal. App. 416, 280 Pac. 181, cited the *Stevens* case, and used the following language: .

"Costs upon appeal are merely incidental to the judgment appealed from (*McCallion v. Hibernia, etc., Society*, 98 Cal. 442, 445 [33 Pac. 329]), and an order awarding costs falls with a reversal of that part of the judgment upon which it is based (*Taylor v. New York Life Ins. Co.*, 148 App. Div. 815 [133 N. Y. Supp. 746])."

We hold that, under the portion of § 9, of initiative 141, above referred to, any allowance of attorney's fees made by the superior court in favor of an applicant who prevails in that court is vacated if on appeal the judgment of the superior court is reversed. The "decision in favor of the applicant," referred to by the statute, means the final decision—that of the superior court if the case is not appealed, or the judgment of this court if the case be appealed.

The briefs filed in these three consolidated cases cover a wide range, and touch upon some questions not germane to the issues presented. On the one hand, we are invited to assume administrative functions which properly pertain to the executive branch of the state government here represented by the de-

partment, while on the other hand, it is argued that the appropriate judicial functions of the courts in considering such questions as are here presented should be unduly restricted. *Amici curiae* ably present interesting and important constitutional questions which, if considered in detail, would themselves require a lengthy opinion. We have considered all the questions presented, and have endeavored to discuss them within the limits of an opinion not unreasonably extended.

Within the four corners of these cases, we find no question properly before us for determination, which concerns the department's negotiations or administrative relations with the Federal department or any Federal authority. These cases present for our consideration orders of the department which affect the respective recipients who are parties to the three consolidated cases, and no questions of law or fact outside the scope of matters pertinent to this inquiry should be considered.

Most careful study of the record convinces us that there is nothing before us which shows that the department has not proceeded according to law, or has in any way acted illegally or without statutory warrant. We find in the record no basis or justification for a holding that, in making the orders before us for review, the department has acted arbitrarily or capriciously or pursuant to an unlawful or unwarranted plan or system, or, in establishing its method of procedure, has acted upon a fundamentally wrong basis.

We hold that no showing has been made which justifies a judicial decision that any departmental order affecting any recipient in these consolidated cases should be modified or reversed.

The judgment of the superior court for Jefferson

county, in the case of James R. Morgan v. Department of Social Security, is reversed, with instructions to enter an order affirming the decision of the department in that case.

The judgments of the superior court for Thurston county in the cases of Laura M. Camfield v. Department of Social Security, and William L. Jacobson v. Department of Social Security, respectively, are affirmed.

ROBINSON, C. J., MAIN, BLAKE, STEINERT, JEFFERS, and DRIVER, JJ., concur.

SIMPSON, J. (dissenting)—I am unable to agree with the majority opinion, and therefore dissent upon the following grounds.

The act, as passed by the people of this state, acting in their capacity as legislators, gave to the senior citizens a minimum of forty dollars per month regardless of the action of the national social security board, and the act as interpreted by the majority is unconstitutional.

In the first place, I desire to call attention to some fundamental rules of statutory construction. By those rules I shall demonstrate that the "senior citizens grants act" passed by the people of this state in 1940, Laws of 1941, chapter 1, commands the payment to senior citizens qualifying under the act of "not *less* than $40 per month on a uniform state-wide basis, minus the income of applicant from other sources." (Italics mine.)

The rules of statutory construction must be applied to the entire act, and each and every of its provisions given effect whenever possible. *State ex rel. Port of Seattle v. Department of Public Service,* 1 Wn. (2d) 102, 95 P. (2d) 1007; *Arden Farms Co. v. Seattle,* 2 Wn. (2d) 640, 99 P. (2d) 415.

Legislative acts will not be construed as to cause a conflict. *Rosenoff v. Cross,* 95 Wash. 525, 164 Pac. 236.

Some meaning rather than none should be given to the language contained in the act. *Dernac v. Pacific Coast Coal Co.,* 110 Wash. 138, 188 Pac. 15.

The court must examine the history of the law in order to ascertain its true meaning. *Shelton Hotel Co., Inc. v. Bates,* 4 Wn. (2d) 498, 104 P. (2d) 478; *Seattle v. Reed,* 6 Wn. (2d) 186, 107 P. (2d) 239; *Ayers v. Tacoma,* 6 Wn. (2d) 545, 108 P. (2d) 348.

The legislature is presumed to have knowledge of existing statutes. *State v. Thornbury,* 190 Wash. 549, 69 P. (2d) 815.

The court in ascertaining the meaning of a statute will not follow executive construction when contrary to the clear intent of the statute. *State v. Davies,* 176 Wash. 100, 28 P. (2d) 322; *State ex rel. George v. Seattle,* 184 Wash. 560, 52 P. (2d) 360; *Albrecht v. Department of Labor & Industries,* 192 Wash. 520, 74 P. (2d) 22; *Pryor v. Safeway Stores,* 196 Wash. 382, 83 P. (2d) 241, 85 P. (2d) 1045; *Smith v. Northern Pac. R. Co.,* 7 Wn. (2d) 652, 110 P. (2d) 851.

The court in construing legislative acts must put itself in the light which the legislature enjoyed. *Linn v. Reid,* 114 Wash. 609, 196 Pac. 13.

All of the rules relative to the construction of legislative acts should be used to ascertain the true intent which the people of this state had when they passed the act in question, for the reason that the intent is the controlling factor in construing any statute.

I will now recount the history of the constitutional and legislative efforts to aid those in need, and with that history in mind bring to bear the other rules of construction in order to show that the people of this state meant just what they said when they passed initiative No. 141 by a majority of 99,190 votes.

The territorial legislature, Code 1881, § 2696 to § 2706, inclusive, made definite provisions for "every poor person who shall be unable to earn a livelihood."

The framers of our constitution recognized the duty of the state toward the poor by adopting Art. VIII, § 7, which reads:

"No county, city, town, or other municipal corporation shall hereafter give any money or property, or loan its money or credit, to or in aid of any individual, association, company, or corporation, except for the necessary support of the poor and infirm, . . ."

Hill's Code (1891), § 283, provided that the board of county commissioners were "vested with the entire superintendence of the poor."

This remained the law until 1933, at which time the legislature of this state, chapter 29, p. 173, Laws of 1933, made more elaborate provision for the poor by providing for "old age pensions." The maximum allowed by this act was thirty dollars per month to be paid by the various counties in the state.

In 1935, the legislature passed an act, chapter 182, p. 855, which repealed chapter 29, Laws of 1933, and changed the theory of providing for those poor who were aged by making their care one of state concern.

The situation present in 1937 is well stated in *Conant v. State*, 197 Wash. 21, 84 P. (2d) 378, in the following language:

"In 1937, asserting that public policy declares with increasing frequency and firmness that the equalization of opportunity for more abundant living and the necessary care of the handicapped and underprivileged incident thereto, is a public responsibility of such magnitude as to deserve the undivided attention of all branches of the state and Federal governments, the legislature created an administrative state department and divisions thereof to serve as an agency of the state in the administration of all public assistance programs.

"Laws of 1937, chapter 111, p. 442, created the department of social security and its several divisions. Laws of 1937, chapter 114, p. 452 (Rem. Rev. Stat. (Sup.), § 9992-101 [P. C. § 6233-101]), provides for aid to dependent children. Laws of 1937, chapter 132, p. 489 (Rem. Rev. Stat. (Sup.), § 10007-1 [P. C. § 6233-53] *et seq.*), establishes within the department of social security a division for improving the condition of the blind. Laws of 1937, chapter 156, relates solely to old-age assistance, prescribes the qualifications for eligibility for old-age assistance, and provides for minimum payment to applicants who are eligible under the act for old-age assistance. Laws of 1937, chapter 162, p. 574 (Rem. Rev. Stat. (Sup.), § 9998-101 [P. C. § 6233-301] *et seq.*), provides for relief from involuntary unemployment. Laws of 1937, chapter 180, p. 697 (Rem. Rev. Stat. (Sup.), § 10007-101 [P. C. § 6233-201] *et seq.*), is the administrative code of the department of social security. Its provisions govern the procedure necessary to be followed in order to secure public assistance or to prosecute appeals in those cases in which the applicant for assistance is dissatisfied.

"Section 22, chapter 180, Laws of 1937, p. 709 (Rem. Rev. Stat. (Sup.), § 10007-122), repealed the statute (Laws of 1854, pp. 395-397, Rem. Rev. Stat., §§ 9981-9984, inclusive, and *id.*, §§ 9987-9991, inclusive) requiring certain relatives (if such relatives are 'of sufficient ability') of every poor person who is unable to earn a livelihood because of physical or mental disability to support such poor people."

In passing upon the question presented, the majority opinion in that case stated:

"The legislature imposed a mandatory duty of payment of old-age assistance of not less than thirty dollars monthly to those who satisfy the statutory prerequisites recited above. We must declare the law as it is written."

The *Conant* case held that the fact that relatives of an applicant are willing and financially able to furnish such applicant with the necessities of life did not affect his right to receive such assistance from the state.

In 1939, the legislature, being aware of the decision in the *Conant* case, passed chapter 25, p. 81, § 3, in which it is stated that old-age assistance was not to be given as a matter of right, but should be available to persons in need as that term was defined in the act. The definition of the term was:

"A person shall be considered to be in need within the meaning of this act who does not have resources sufficient to provide himself and dependents with food, clothing, shelter and such other items as are necessary to sustenance and health. 'Resources' are hereby defined to be (1) assistance in cash, in kind, or in support given by relatives, friends or organizations, (2) ability of relatives within the classes described in this section to contribute to such support: . . ." (Rem. Rev. Stat. (Sup.), § 9998-7a.)

The condition of the law just after the passage of the act in 1939 allowed the aged poor to receive a maximum of thirty dollars per month provided that they could not receive assistance from "relatives, friends, or organizations."

It must be especially noted at this point that the acts of 1933, 1935, and 1939 fixed a maximum pension allowance of thirty dollars per month while the acts of 1937 and 1940 were more liberal and fixed the minimum at thirty dollars and forty dollars, respectively.

In 1940, the people of the state, having in mind the history of the constitutional and legislative efforts as interpreted by this court to aid the poor, especially those of mature years, decided to change all existing laws and enacted initiative measure No. 141. They deliberately placed in the act the following provisions, which the national social security board has attempted to repeal:

"(g) 'Income' shall mean regular or recurrent gains in cash or kind, excepting therefrom:

(1) The value of the use or occupancy of the premises in which the applicant resides.

(2) Foodstuffs, livestock, fuel, light or water produced by or donated to applicant or applicant's family exclusively for the use of applicant or applicant's family.

(3) Casual gifts in cash which do not exceed $100 in any one year.

(4) Casual gifts in kind which do not exceed $100 in any one year.

(5) The proceeds from the sale of property which is not a resource, provided such proceeds are used for the purchase of property which is not a resource.

"(h) 'Resources' shall mean any property which the applicant owns legally or beneficially, excepting therefrom:

(1) The ability of relatives or friends of the applicant to contribute to the support of the applicant.

(2) Insurance policies, the cash surrender value of which does not exceed $500.

(3) The homestead, home or place of residence of applicant or the spouse of applicant.

(4) Intangible property or personal property, the cash value of which does not exceed $200.

(5) The personal effects of the applicant, including clothing, furniture, household equipment and motor vehicle.

(6) Foodstuffs, livestock, fuel, light or water produced by the applicant, applicant's spouse or family, exclusively for the use of applicant or applicant's family." Laws of 1941, chapter 1, § 3, p. 4.

The same board has also attempted to repeal that portion of § 9 which allows the parties, on appeal to the superior court, to introduce new evidence.

As illustrative of the idea that the people of this state intended to pay the pension mentioned in the act, I call attention to the fact that the arguments contained in the pamphlet sent to the voters just before the 1940 election stated that passage of initiative 141

would entail the expenditure of twenty-six million dollars to forty million dollars per annum.

The governor of this state and the legislature of 1941 evidently were of the same mind. February 27, 1941, Governor Langlie addressed a special message to the legislature in which he stated:

"It is recognized that Initiative Measure 141 constitutes a mandate from the people to provide the funds which will make possible the full payment of benefits which that measure contemplates. The imposition of new taxes is not a pleasant thing, but the people of our state have placed upon us the responsibility of carrying their will into effect. We must assume that the people intended us to provide the funds with which to pay these old age benefits. The task was left to us to say how those funds should be raised; what sources of revenue are available; which method of raising these funds will be adequate, practical and fair. The previous measures which I have submitted were, in my opinion, adequate, practical and fair to meet the financial needs of the state as they were then known. They are not adequate to meet those needs in the light of the facts now available.

"In my opinion, and in the opinion of the tax commission, an increase in the retail sales tax is the only sure and certain method available at this time to guarantee the required funds."

Thereafter, the senate, March 11th, and the house, March 12th, passed the three per cent sales tax, Laws of 1941, chapter 76, p. 194, section one of which reads:

"Initiative Measure No. 141 approved by the people at the general election of November 5, 1940, provides for greatly increased grants and other benefits to citizens over the age of 65 years. To obtain funds necessary to meet this mandate of the people and to carry on all other state functions, it becomes essential for the state to provide a practical and adequate means for raising substantial additional revenues. It is recognized that the only practical and adequate source of revenue to meet these financial requirements is either

a graduated personal net income tax or an increased retail sales tax and compensating tax. While under existing constitutional provisions the retail sales tax and compensating tax may be increased, it is not known whether a graduated personal net income tax enacted at this legislative session would be declared constitutional by the courts without a validating constitutional amendment. For the purpose of assuring the adoption of a valid method of providing such increased revenue and at the same time allowing the people to decide which type of taxation they prefer, it is hereby declared to be the purpose of this act that from and after its effective date, the retail sales tax and compensating tax shall be 3%, but shall be reduced to 2% upon the enactment and judicial approval of a graduated personal net income tax law."

The act as construed by the majority leaves the old people in a less favorable position, in so far as the monthly payments are concerned, than they were under the 1937 act, as construed by the *Conant* case, and in practically the same position as they were at a time just before initiative measure 141 was passed. In making this statement I realize that other benefit payments have been made under the act.

It is inconceivable that the people of this state intended to perform a useless act by passing the initiative measure. Certainly they had some definite object in mind when they voted upon the act. That object was to pay senior citizens *not less than* forty dollars per month.

The act in question is full and complete and needs no construction. First, it declares the intent; second, it includes definitions of words, terms, and provisions used in the act; then, so that no question could be raised and in order to meet and refute any objection which might be brought forward relative to what income or resources were included in the act, defined in no uncertain language the meaning of those words.

Following the definitions, the act states that each eligible applicant sixty-five years of age or over shall receive the sum of not *less* than forty dollars per month, minus the income from those sources just mentioned in the act. I repeat, the act directs, in fact it commands, the payment of not less than forty dollars per month.

The reference to the wording in § 21, upon which the majority bases its holding, does not in any way refer to the national social security board or give it any power to veto the commands of this state.

As I view it, the holding of the majority constitutes an approval of a violation of the doctrine of the separation of powers. For a discussion of this doctrine, see *Blanchard v. Golden Age Brewing Co.*, 188 Wash. 396, 63 P. (2d) 397.

The majority opinion transgresses this rule in three respects. First, the department, an agency of the executive branch, through nullifying § 3 (g) and (h), by adopting diametrically opposed rules and regulations, in effect usurped the power of repeal heretofore delegated to the legislative branch. Secondly, the department by promulgating rules and regulations as a substitute for § 3 (g) and (h), in effect redrafted the statute, thereby usurping the power of the legislative branch to legislate; and finally, the majority's approval of the department's actions constitutes a transfer of the power vested in the judicial branch in that it allows a Federal administrative agency to construe a law of this state. It is apparent then that the rights of the legislative branch have been encroached upon by both the executive and judicial branches.

The majority contend, however, that the statute expresses an intent to cooperate with the Federal security act and that the two acts are in conflict over the

meaning of "income" and "resources," and that therefore the state act must give way (be rewritten).

Conceding the validity of the majority's first two propositions, still this court is without authority to confer legislative power on the executive branch. In short, the effect of the majority's holding is a veritable trampling on the doctrine of the separation of powers, a doctrine which this court has vigilantly protected in the past. *Uhden, Inc. v. Greenough,* 181 Wash. 412, 43 P. (2d) 983, 98 A. L. R. 1181; *Griffiths v. Robinson,* 181 Wash. 438, 43 P. (2d) 977.

Likewise assuming, again for the purpose of argument, the validity of the majority's propositions, yet the department is without power to redraft or rewrite by rules and regulations a subsection of the act. Although a desire to secure Federal matching funds was expressed, yet this cannot be interpreted as a conference of power on the board despite the opinion of the department.

Since the department is totally dependent upon the statute for its rule-making power, it cannot use (legally) that which was not granted. Despite the fact the majority stated accurately the rule with reference to legislative delegation of power to administrative agencies, they failed to apply it correctly. More specifically, in applying the rule to the facts, they did not recognize the difference between an administrative agency which determines conditions and then promulgates rules harmonizing them of course with the provisions of the statute to be administered, in order to effectuate the statute's policy, and the instant case of an administrative agency which promulgated rules and regulations which, in effect, amounted to a statutory amendment or the repeal of a portion of a statute.

That such exercising of power is unauthorized and the rules void is demonstrated by the following authorities.

In *Washington Printing & Binding Co. v. State,* 192 Wash. 448, 73 P. (2d) 1326, the tax commission levied a sales tax on respondent for what it contended were sales of freight tariffs and supplements. Under its rule-making power, the commission had promulgated a rule relating to the printing industry which imposed a tax on printing. On appeal, the commission urged that its rule-making power permitted the rule creating the tax, notwithstanding a failure of the statute to cover the instant situation. In answer to this contention, we said:

"The tax commission cannot, by such rule, impose a tax upon property or a transaction that is not mentioned in the statute as taxable. The rule-making power is given only for the purpose of empowering the commission to carry out the provisions of the statute."

Again, in *Ernst v. Kootros,* 196 Wash. 138, 82 P. (2d) 126, action to collect a tax was initiated by the department of social security under sections of the unemployment compensation act and under one of its rules. Section 19 (f) (1), chapter 162, p. 609, Laws of 1937, provided that an employing unit consisted of "eight or more" individuals. Under its rule-making powers, the department promulgated a rule construing employing unit to mean "one or more" individuals.

In amplifying our statement that "it is not for courts or departments to attempt further legislation by construction," we stated:

"Respondent's Regulation 2, subsection (a), is a departmental construction of a plain law and is an arbitrary usurpation of legislative authority."

That an administrative agency cannot exceed the statutory power granted to it, is well illustrated in

*State v. Miles,* 5 Wn. (2d) 322, 105 P. (2d) 51. In that case, defendant was charged with the crime of offering a reward for display of a deer. The alleged illegality was based on a regulation promulgated by the state game commission. The question to be decided was "whether or not the state game commission had authority to promulgate and enforce the regulation on which the information was based. . . . "

In deciding that the commission was without power to make this regulation, we declared:

"In exercising the rule-making power, however, such administrative officers and boards must act within the limits of the power granted to them. [Citing cases.] The basis for that proposition is, of course, that rules and regulations which have the effect of extending, or which conflict in any manner with, the authority-granting statute, do not represent a valid exercise of authorized power, but, on the contrary, constitute an attempt by the administrative body to legislate. *Anheuser-Busch, Inc. v. Walton,* 135 Me. 57, 190 Atl. 297."

Finally, in *Northern Pac. R. Co. v. Henneford,* 9 Wn. (2d) 18, 113 P. (2d) 545, plaintiff railroad company sought to restrain the tax commission from collecting a use tax. Pursuant to rules and regulations, the commission construed "use" to include "storing" or "withdrawing from storage."

In preventing the collection of the tax, this court said:

"The words 'storing' and 'use' are not synonyms. In our opinion, the statute is not ambiguous, and, therefore, the executive construction has little persuasive effect. *Further than this, the power of the tax commission to make rules, given by the statute, does not authorize them to write into the statute something that the legislature did not put there.*" (Italics mine.)

Since the rules and regulations in question were promulgated in excess of statutory power, they cannot

legally operate to impose unwarranted deductions on recipients' grants.

MILLARD, J. (dissenting)—I concur in the opinion of Judge Simpson that the act, as passed by the people of this state functioning as legislators, gave to the senior citizens a minimum of forty dollars monthly regardless of the action of the national social security board, otherwise the act is unconstitutional.

The author of the dissenting opinion in *In re Hudson*, 13 Wn. (2d) 673, 126 P. (2d) 765, said that a penal statute then in force furnished some light on the attitude of the legislature toward the problem there presented and served to evince a legislative recognition of the parental duty to provide a child with medical and surgical care.

In *Conant v. State*, 197 Wash. 21, 84 P. (2d) 378, the majority opinion of this court was to the effect that, under the constitution and the statute before us, old-age assistance in this state was a matter of right. In our interpretation of the statute there involved, we stated that repeal of the statute which required certain relatives of poor persons who were unable to earn a livelihood to support such poor people disclosed an intention on the part of the legislature to absolve such relatives from that legal liability. We also stated that any argument that cost of the pension program to the state would have a serious effect on the fiscal problems of this state should be addressed to the legislature and not to the court.

The dissent to that opinion was on the grounds, first, of moral duty implicit in one of the commandments written by Jehovah on Mt. Sinai imposed upon children to support their needy parents; and, second, inability of the state government to make the payments required. Further stressing disagreement with the

majority opinion in *Conant v. State, supra,* and again attacking the majority's interpretation of the statute as specious, the author of the dissenting opinion concurred, as follows, in the result of the majority opinion in *Hart v. Grays Harbor County,* 197 Wash. 604, 86 P. (2d) 198:

"It seems to me that the rule laid down by the majority in the *Conant* case and purporting to be arrived at by interpretation of Laws of 1937, chapter 156, p. 548 (Rem. Rev. Stat. (Sup.), § 9998-3 [P. C. § 6233-153] *et seq.*), to the effect that an applicant for old-age assistance, if qualified, becomes entitled to it as a matter of right and that the right vests as of the date of his or her application, . . . I am content, however, to see the rule disregarded, because it is so clearly and so obviously unsound."

While in a highly moral sense, it may be the duty of one to care for his or her poor relatives, in a legal sense it is not; that legal duty has been imposed upon the state. In morals, the rule laid down by our Savior is that the mere imagining or designing of evil is equivalent to the doing; but in our jurisprudence no such rule prevails. The moral duty to care for one's poor relatives is one, since repeal of the statute requiring such care, of which courts may not take cognizance. It would hardly be contended that, while the law of etiquette provides that a person civilly addressed shall return a civil answer, a court would have jurisdiction to entertain a suit to enforce this provision or punish because of its breach.

If one statute in force supplies light on the attitude of the legislature in another enactment, it cannot be gainsaid that, by the repeal of one statute and enactment of another or other statutes at the same time on the same subject, some light is not given on the attitude of the legislature toward the problem it was attempting to meet at that time.

In so far as the assistance of one's relatives is concerned, at the common law no legal liability rested on one relative to support another, however strong the moral duty may be. The duty of providing such support is purely statutory, and the procedure providing for its enforcement is exclusive. *Conant v. State, supra.*

The statute imposing the legal liability, which did not exist at the common law, upon certain relatives to support a poor relative who was unable to earn a livelihood because of mental or physical disability, was repealed by the social security statute (Laws of 1937, chapter 180) which declared that the burden of caring for the handicapped and underprivileged was a public responsibility which the state assumed. Except morally, since the enactment of Laws of 1937, chapter 180, p. 697, one relative is not liable nor responsible for the care of another relative who may be "poor" or "in need" because of mental, physical, or other handicap. Enactment of Laws of 1939, chapter 25, p. 80, did not change the moral duty to a legal one; only the needy aged were penalized if they had relatives within the statutory classification financially able to contribute to their support.

"The social security statutes manifest recognition by the state of its obligation and disclose the purpose of the legislature to redeem a promise made to the people, to relieve charitably disposed relatives, strangers, societies, associations, and other agencies of the burden of providing relief for the crippled, the blind, the needy, as the care of the handicapped and underprivileged is a responsibility of the state.

"The law is plain that, while the amount and nature of old-age assistance which the applicant shall receive, and the manner of providing it, shall be determined by the department with due regard to the conditions existing in each case, such assistance, together with the applicant's *own* resources and income, shall

not be *less* than thirty dollars monthly to each recipient.

"The fact that some kindly disposed stranger, or that some charitably motivated relative, is willing and financially able to pay for the clothing, lodging, and food of the respondent, in nowise absolves the state of its duty or relieves it of its obligation to grant to her old-age assistance in a sum not less than thirty dollars monthly. If respondent were compelled to beg from door to door, or if she were dependent on some one of the many charitable associations for support, her *need* would be no greater than if compelled, as she now is, to accept the necessary relief of food, lodging, and clothing gratuitously bestowed on her by a son-in-law and daughter (relatives who are not legally liable or responsible for her care).

"The legislature imposed a mandatory duty of payment of old-age assistance of not less than thirty dollars monthly to those who satisfy the statutory prerequisites recited above. We must declare the law as it is written.

"The naive argument that the cost to the state, in view of the fact that, on January 1, 1937, there were approximately 123,000 persons more than sixty-five years old in this state, would have a serious effect on the fiscal problems of the state, should be addressed to the legislature and not to the court." *Conant v. State,* 197 Wash. 21, 84 P. (2d) 378.

The people, acting as legislators, expressed by initiative 141 their disagreement with the dissenting opinion in *Conant v. State, supra,* the concurring opinion quoted above in *Hart v. Grays Harbor County, supra,* and Laws of 1939, chapter 25. The people do not agree that the rule enunciated in *Conant v. State, supra,* should be "disregarded, because it is so clearly and so obviously unsound."

I am as firmly convinced, as when I wrote the majority opinion in that case, of the correctness of the rule announced therein. *(Conant v. State, supra.)* In the light of the history of old-age assistance legislation

within this state, it is impossible for me to believe that the people, acting as legislators in enactment of initiative 141, contemplated any such construction of that initiative as has been given by the majority. A proper respect for the legislature—whether acting as a Senate and House of Representatives or the exercise by the people of the power reserved in themselves of enacting laws at the polls independent of the legislature—forbids an interpretation which would be so contrary to human nature. I am convinced that the people, acting as legislators, did not act ignorantly nor did they act dishonestly. I am sure that they were mindful of the apprehension expressed in the dissenting opinion in *Conant v. State, supra:*,

"I am firmly of the opinion that, if this debacle occurs, it will be the fault of the majority."

After all, the *debacle* (demoralization of the old-age assistance program because of inadequacy of state funds to match Federal grants) is a fiscal problem which is without the province of this court. Any argument as to the possible or probable *debacle,* which I do not apprehend will occur (if it occur the legislature, not the court, must provide therefor), should be addressed to the legislative branch of the government and not to the judicial. With that problem in mind, the people enacted initiative 141 as they had the right and power to do.

The foregoing opinion was written and released July 6, 1942, the same day the case was placed on the desk of the undersigned.